THE FIFTH WARD SAVINGS BANK OF JERSEY CITY v. THE FIRST NATIONAL BANK OF JERSEY CITY.

1. Coupon bonds issued by a municipal corporation under competent legislative authority, and payable to bearer, are commercial securities the title to which passes by delivery.

2. Commercial securities of this character are an exception to the rule that one cannot give a better title to personal property than he has himself; and as between the holder of such securities, who has taken them before maturity for value, and the real owner from whom they were obtained by fraud or felony, the title of the former will prevail unless he took title *mala fide.*

3. In trover by the rightful owner of commercial securities, obtained from him by fraud or felony, against a subsequent holder—*Held,*
   1. That proof by the plaintiff that the securities were obtained from him by fraud or felony casts the burden on the defendant of proving that he became the holder *bona fide* and for value.
   2. That proof by the defendant that he became the holder before maturity, and for value, in the due course of business, fulfilled the burden of proof laid upon him. From these facts the law will imply that he is a *bona fide* holder, and unless there be circumstances apparent in the case from which bad faith on his part may be inferred, the court should direct a verdict in his favor.

4. Corporations created for business purposes, unless restrained by charter or by some statute, have, as a necessary incident, the power of incurring debts in the course of their legitimate business, and of making negotiable paper in payment of such debts.

5. A savings bank, incorporated by special charter, has the implied power, inherent in corporations created for business purposes, of borrowing money required in the course of its business, and of making negotiable paper, or a pledge of its securities as a means of borrowing; and a purchaser of such paper, before maturity, from a third person, in whose hands it is apparently as business paper, has a right to act on the assumption that it was made for a purpose which gives validity to the paper and to the pledge of securities therewith.

6. The treasurer of a savings bank is not, *virtute officii,* invested with the power of borrowing money for the institution and pledging its securities as collateral.

7. An officer of a corporation may, by the acts of its directors or managers, be invested with capacity to bind the company by his acts beyond those powers which are inherent in his office; as where, in the general course of the company's business, the directors or managers have permitted an officer to assume the control and direction of its affairs, and have held him out to the public as its general agent, his

authority to act for the company in a particular transaction may be implied from the manner in which he has been permitted by the directors or managers to transact its business.

8. B. was president of the City Bank, and also treasurer of the savings bank. As treasurer of the savings bank, he was the custodian of certain coupon bonds, payable to bearer, and negotiable securities, the property of the savings bank. The City Bank was a debtor to the First National Bank, and transmitted to it three notes, one purporting to be made by W. H. Jasper, another by J. B. Penrose, and the third by the savings bank. Accompanying these notes, and mentioned in them as collateral security, were a number of the bonds belonging to the savings bank. The Jasper note was discounted to the credit of the City Bank; the other notes were carried to the credit of the City Bank on its indebtedness. These notes came from the City Bank as business paper held by it under discount, and were accepted by the First National Bank as such in good faith. The Jasper and Penrose notes were forgeries. The savings bank note was made by B. without authority. B. used its bonds without authority, and the savings bank derived no benefit from the transactions. In an action of trover by the savings bank against the First National Bank to recover the bonds—*Held*, that the bonds being negotiable securities, the title to them passed to the First National Bank by the delivery of them by the City Bank, in whose possession and apparent ownership they were, and that their negotiable quality as commercial securities was not impaired by the fact that the Jasper and Penrose notes were forgeries, and that the savings bank note was made without authority.

9. In addition to the above transaction, B., as treasurer of the savings bank, obtained the discount, by the First National Bank, of two notes of the savings bank signed by him as treasurer. Accompanying these notes, and as collateral security, were certain other negotiable coupon bonds, payable to bearer, belonging to the savings bank. The discount was applied for to the credit of the savings bank. B. had no authority to make the notes and apply for the discount, and the proceeds were not received by the savings bank. In trover for the last-mentioned bonds—*Held*,

1. That the First National Bank, having dealt in this matter with an officer of the savings bank, whose duties, as defined by the charter and by common usage, were the duties of a special agent, assumed the risk of the authority of the officer to contract the loan and pledge the securities in payment; and

2. That an instruction to the jury that B., as treasurer of the savings bank, had no power, *virtute officii*, to borrow money for the institution and give its notes or pledge its securities in payment, but that if B. was held out by the managers of the company in the general course of its business as being its agent with such authority, his acts as such agent would be binding upon the company, was correct.

On error to the Hudson Circuit Court.

The Fifth Ward Savings Bank brought an action against the First National Bank of Jersey City, in trover, for the conversion of twenty-five bonds, as follows:

| | | | | | | | |
|---|---|---|---|---|---|---|---:|
| 10 Jersey City Improvement 7 per cent. bonds, $1000 each, | | | | . | . | . | $10,000 |
| 13 Bayonne City 5 per cent. bonds, $1000 each, | | | | | | | 13,000 |
| 1 " " 7 " | | | | bond, $1000 | | . | 1,000 |
| 1 " " 6 " | | | | " $500 | | . | 500 |

These bonds were issued by the municipalities named, in virtue of legislative authority. They matured in the years 1891, 1894 and 1911, with coupons attached for the payment of interest semi-annually.

Prior to the transactions hereinafter detailed, the bonds were the property of the savings bank. The First National Bank claimed title to them under a pledge of them as collateral securities for discounts, loans and advancements.

At the trial, both parties took exceptions to the charge of the trial judge, and each party sued out a writ of error, and assigned errors upon exceptions taken.

The assignments of error by both parties were argued at the same time.

For the Fifth Ward Savings Bank, *T. N. McCarter*.

For the First National Bank, *J. D. Bedle*.

DEPUE, J.   The bonds in controversy were coupon bonds, payable to bearer, and issued under competent legislative authority. They were negotiable securities, capable of being transferred by delivery, and the title of a *bona fide* holder of such securities is valid notwithstanding the person from whom he received them obtained possession of them from the real owner by fraud or felony.   *Boyd* v. *Kennedy*, 9 *Vroom* 146; *Copper* v. *Jersey City*, 15 *Vroom* 634.   Commercial securities

of this character are an exception to the rule that one cannot give a better title to personal property than he has himself, and as between the holder who has taken them before maturity, for value, and the real owner from whom they were obtained by fraud or felony, the title of the former will prevail unless he took his title *mala fide*. Proof that such a holder took the securities under suspicious circumstances is not sufficient to defeat his title. That result can be produced only where he has taken title in bad faith. *Murray* v. *Lardner*, 2 *Wall.* 110; *Hotchkiss* v. *National Banks*, 21 *Wall.* 354; *Hamilton* v. *Vought*, 5 *Vroom* 187; *Bank of Republic* v. *Young, Receiver*, 14 *Stew. Eq.* 531

With respect to some of the bonds the trial judge directed a verdict for the defendant. This judicial action is made a ground of exception by the plaintiff—the contention being that the validity of the defendant's title should have been submitted to the jury. Under the rule that at one time prevailed, that the title of the holder of negotiable paper was defeated by proof of circumstances of suspicion such as would have put a person of ordinary prudence upon inquiry, there being no judicial standard by which the force of suspicious circumstances upon a person of ordinary prudence could be measured, if there were any circumstances of an unusual character the question was necessarily a matter to be submitted to the jury. This doctrine was established by *Gill* v. *Cubitt*, 3 *B. & C.* 466. But that case has been overruled, and the law established in this state that the title to a note fraudulent in its inception cannot be invalidated in the hands of a party taking it for value before maturity, unless actual fraud can be shown in such party in taking it. *Hamilton* v. *Vought*, 5 *Vroom* 187; *National Bank of Republic* v. *Young, Receiver*, 14 *Stew. Eq.* 531. With the change in the legal rule by which the rights of the holder of such paper are governed, a change was effected in the forum by which the validity of the holder's title was to be considered—that which, under the former rule, was necessarily a jury question, under the modern rule became, to a great extent, a question of law. In Hamilton *v.* Vought,

Chief Justice Beasley, in speaking of the rule adopted in Gill v. Cubitt, said : " Its defect was that it provided nothing like a criterion on which a verdict was to be based, * * * and it is precisely this want which the modern rule supplies. When *mala fides* is the point of inquiry, suspicious circumstances must be of a substantial character, and if such circumstances do not appear the court can arrest the inquiry. Under the former practice, circumstances of slight suspicion would take the case to the jury ; under the present rule, the circumstances must be strong, so that bad faith can be reasonably inferred. Thus the subject has passed from the indefinite to the comparatively definite, from the intangible to the comparatively tangible. From mere matter of fact, the question, to some extent, has become one of law." Substantially the same views were expressed by Mr. Justice Clifford. In discussing an instruction by the trial judge for a verdict in favor of the holder of a negotiable bond illegally issued, without submitting the question to the jury, that learned judge said that " the modern decisions have established the more reasonable rule that before the evidence is left to the jury there is or may be, in every case, a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed." *Commissioners of Marion Co.* v. *Clark,* 4 *Otto* 278-284.

It is undoubtedly true that where the maker or endorser of negotiable paper proves that it was obtained from him by fraud, or that it was fraudulently put in circulation, the burden of proof is shifted. The mere possession of negotiable paper, obtained or issued under such circumstances, is not enough. The plaintiff, in order to recover on such paper, must prove that he took it before maturity, *bona fide* and for value. *Duncan* v. *Gilbert,* 5 *Dutcher* 521 ; *Holcomb* v. *Wyckoff,* 6 *Vroom* 35 ; *Stewart* v. *Lansing,* 14 *Otto* 505. But when in such a case the plaintiff has shown that he became the holder of the paper before maturity, and for value, in the due course

of business, he has established all the facts that are necessary to fulfill the burden of proof laid upon him. From these facts the law will imply that he is a *bona fide* holder, and unless there be circumstances disclosed in the case or produced by the defendant by way of rejoinder, from which bad faith on his part may be inferred, the court should withdraw the case from the jury and direct a verdict in favor of the holder of the paper.

All of the bonds in controversy were the property of the savings bank. They were received by the First National Bank from Garret S. Boice as security for loans and advances. The savings bank derived no benefit from these transactions. Boice was secretary and treasurer of the savings bank, and president of the City Bank, which was a bank of discount and deposit. The savings bank kept an account in the City Bank, and the City Bank kept an account with the First National Bank. Boice, as treasurer of the savings bank, was the lawful custodian of the bonds, but he had no authority from the savings bank to make this use of them. Boice, being the lawful custodian of the bonds, his unlawful appropriation of them will not defeat the title of the First National Bank as a holder for value, unless it appears that the latter bank took them from Boice with knowledge that he was misappropriating these securities, or under circumstances from which bad faith in the officers of the bank in taking them may be inferred.

The transactions of the First National Bank with Boice were of two kinds, the one by way of loans, advances and discounts to the credit of the City Bank, on the application of Boice as president of the bank; the other, discounts to the credit of the savings bank, on the application of Boice as treasurer of the savings bank.

On the 11th of October, 1882, the cashier of the City Bank sent to the First National Bank, for collection, a note purporting to be made by one William H. Jasper, for $4000, dated July 5th, 1882, payable to his own order, at the City Bank, on demand, with interest, it being recited in the body of the

note that four city of Bayonne funded tax bonds, Nos. 11, 12, 13 and 14, $1000 each, were deposited as collateral security, with power to sell, &c. On the 1st of December, 1882, Boice, as president of the City Bank, applied to the First National Bank to have the Jasper note discounted, and it was discounted, and the proceeds were placed to the credit of the City Bank.

On the 2d of December, 1882, the cashier of the City Bank enclosed to the First National Bank nine notes for collection, among which was a note purporting to be the note of the savings bank, dated December 2d, 1882, signed and endorsed by Boice as treasurer, for the sum of $5000, and payable on demand at the City Bank, it being stated therein that six Bayonne city bonds of $1000 each, Nos. 2, 3, 4, 5, 6 and 7, were deposited as collateral security, with authority to sell, &c.

On the 29th of December, 1882, the City Bank transmitted to the First National Bank a note for $4000, purporting to be made by Thomas B. Penrose, dated December 27th, 1882, payable to G. S. Boice, president, or order, at the City Bank, one month after date, and endorsed by Boice, in which it was stated that three Jersey City bonds, $1000 each, Nos. 3201, 503 and 313, and one city of Bayonne bond, $1000, No. 76, and one city of Bayonne bond, $500, No. 209, were deposited with Boice as collateral security, with authority to sell, &c.

The collaterals mentioned in these notes were transmitted to the First National Bank at the same time that the notes were sent.

The City Bank was a large borrower from the First National Bank, and was generally a debtor in considerable sums for loans and advances. When the City Bank failed, in January, 1883, it owed the First National Bank about $43,000. As the means of securing these loans and advances, the proof is that there was a general arrangement between the two banks that all paper sent by the City Bank to the First National Bank should be held as security for moneys loaned and to be advanced.

The Jasper note was discounted, and the proceeds placed to

the credit of the City Bank. The president of the First National Bank testified that the Penrose note and the savings bank note of December 2d, 1882, were transmitted for collection and security for the indebtedness of the City Bank. He also testified that when the savings bank note was received from the City Bank he understood that the City Bank held the note for money it had loaned the savings bank, and that it was sent to the First National Bank for collection and security as other notes were. The evidence fully warranted the charge of the judge that the savings bank note was sent from the City Bank as its property with the securities, under an assertion of ownership, and upon the account of the City Bank. The note was afterwards discounted by the First National Bank to the credit of the savings bank, at the request of Boice. But I think with the judge that the transaction should be considered on the footing of the arrangement under which the note was originally sent—as business paper held by the City Bank and sent to the First National Bank for collection and as security for the indebtedness of the City Bank.

The trial judge held that the title of the First National Bank to all the securities above named was good, and for them directed a verdict in favor of the defendant. To this instruction, the plaintiff took an exception.

The evidence shows that the notes above mentioned were received in due course of business for an adequate consideration, and that the securities mentioned in them were delivered to the defendant as a pledge for the payment thereof; and there is no evidence from which bad faith on the part of the defendant's officers in accepting the notes and securities which accompanied them could be inferred.

But it is contended that these transactions are taken out of the rule applicable to negotiable securities by the special circumstances of this case. The Jasper and Penrose notes were forgeries, and it is insisted that the note of the savings bank was not commercial paper within the rule, and, though in the possession of the City Bank as the ostensible owner, was incapable of being negotiated so as to give the defendant the

rights of a holder of negotiable paper, for the reason that the savings bank had no power to make and issue such paper.

The First National Bank took the Jasper and Penrose notes in the belief that they were genuine, and the savings bank note with the understanding that it was regular business paper held by the City Bank.

The title which the law confers upon a *bona fide* holder of negotiable securities arises from the negotiable quality of such securities, and the invalidity of the Jasper and Penrose notes cannot detract from the negotiable quality these securities possess. It is insisted that the title in the bonds the defendant bargained for was the title of Jasper and Penrose, and it is said that these persons having no title to the bonds, and not being debtors upon the notes, the title the defendant purchased has failed. But this contention discards the circumstance that those securities have in themselves a negotiable character, in virtue of which delivery by one having possession confers title without regard to the rightful ownership, and that the defendant does not need to make any other title than such as springs from a delivery for value.

The recital in these notes is not the real source of the defendant's title to the accompanying securities. The transaction which gives the defendant title to the securities occurred between the defendant and the City Bank. The notes were in the possession and apparently in the ownership of the City Bank, and by the recital in them the securities are assumed to have been deposited with the City Bank as securities pledged to it, and therefore its property. The theory of the law by which the negotiability of securities of this character is maintained is that, as in favor of a *bona fide* holder for value, such securities are conclusively presumed to be the property of the person from whom they are obtained by delivery, and until the *bona fide* character of the transfer is overcome the right of no other person in them will be recognized. Possession transferred to a *bona fide* holder is proof of title, and the transaction must be considered as if the City Bank was in fact the owner, for it is its possession and its delivery of the securities

to the defendant for value that in law constituted the defendant's title.

Another contention is that the Jasper note was overdue and dishonored when it was discounted by the First National Bank, and that therefore the latter bank was not a *bona fide* holder in the legal acceptation. Call loans on notes payable on demand, with interest, with collaterals which are the substantial security relied on, are a common method with banks of loaning unemployed funds, and it is usual to raise money, when required by the exigencies of business, on such notes and collaterals, by transferring them to other banks. A decision that such notes, as overdue and dishonored paper, impaired the title to the accompanying collaterals in the hands of the subsequent taker, would excite alarm in business circles. The answer to this contention is that the plaintiff makes no title under Jasper and Penrose, and that the defendant, as the holder of the securities put in as collaterals, took them by a title inherent in the securities themselves.

Nor does the fact that the defendant accepted these securities upon the assumption that Jasper and Penrose were the original owners affect the standing of the defendant as a *bona fide* holder. Boice used the forged notes for the purpose of giving his use of the securities the appearance of a regular business transaction, to deceive the defendant. His fraudulent conduct cannot alter the situation of the defendant, for only *mala fides* in the taker of such securities will operate to impeach his title. If the law were otherwise the purchaser of commercial paper who buys it from one who has obtained possession by fraud or felony would always hold it by a precarious title, no matter how cautiously and honestly he may have acted in making the purchase; for, by assuming to sell and dispose of the paper, the felon impliedly represents that he is either the rightful owner or has authority from the lawful owner to dispose of it.

With respect to the savings bank note of December 2d, 1882, I have already said that this note also came from the City Bank as business paper held by it. It is conceded that if the savings bank had no power to borrow money and make

negotiable paper, the note in question and the pledge of the securities named in it to the City Bank were invalid, and that the invalidity of the transaction would attach to the note and the pledge of the securities in the defendant's hands.

The savings bank was incorporated by a special act, with the usual powers of a savings bank—to receive money on deposit and invest the same for the benefit of depositors. *Pamph. L.* 1863, *p.* 431. The charter gave no express power to make negotiable paper. The only provision on that subject is that the institution should not issue any notes or bills —a provision designed to interdict the business of banking. *Allaire* v. *Howell Works,* 2 *Green* 21.

The powers of a corporation are two-fold—those that are derived from express grant, and those that are incident and necessarily appertain to it, whether expressed in the grant or not. *Leggett* v. *N. J. Manufacturing Co., Saxt.* 541. Every corporation created for transacting business, unless restrained by its charter or some statute, has, as a necessary incident, the power of incurring debts in the course of its legitimate business, and of making and endorsing negotiable paper in payment of such debts. *Lucas* v. *Pitney,* 3 *Dutcher* 221 ; *The National Bank of Republic* v. *Young, Receiver,* 14 *Stew. Eq.* 531 ; *Stratton* v. *Allen,* 1 *C. E. Green* 229 ; *Curtis* v. *Leavitt,* 15 *N. Y.* 9 ; 1 *Dan. Neg. Inst.,* § 382. In discussing this subject Chief Justice Beasley declares that such a power " is the appropriate product of the principle that corporate powers which are the necessary accompaniments of powers conferred will be implied," and that in those instances where " the ability to borrow money is so essential that without it the business authorized could not be conducted with reasonable efficiency, as it cannot be supposed that it was the legislative intent to leave the company in so imperfect a condition, the inference is properly drawn that the power to raise money in this mode is inherent in the very constitution of such corporate bodies." *Town of Hackettstown* v. *Swackhamer,* 8 *Vroom* 191. In Lucas *v.* Pitney, Chief Justice Green said that " the power of incurring debts in the course of its legitimate business of

giving notes or borrowing money for the payment of such debts, would seem necessarily incident to every corporation whose business involved the expenditure of large sums of money, and often upon sudden and unforeseen contingencies."

In *Mutual Life Insurance Co.* v. *McKelway*, 1 *Beas.* 133, Chancellor Williamson recognized this power of borrowing money and making contracts for loans, as an incidental power residing in a mutual insurance company, as the means necessary to raise money in case the company should incur a loss and not have the available means to meet it without contracting for a loan to meet the emergency.

Savings banks are established for business purposes. Their functions are to receive, hold and invest moneys that may be deposited with them, and to repay the money deposited under reasonable regulations in their by-laws. In order to make the business successful, these institutions are required to keep their money invested as closely as may be consistent with the ordinary demands of depositors. But in seasons of financial excitements they may be subjected to extraordinary demands from depositors, to meet which and save the credit of the institutions, large sums of money may be required to be raised on sudden and unforeseen contingencies. At such times, the securities such institutions usually hold are likely to be depressed in the market, and unsalable except at ruinous sacrifices. If these institutions should not have the power to borrow money and to make negotiable paper, or make a pledge of securities on which money may be borrowed temporarily, great sacrifices in the sale of the securities in which the trust funds are invested, if not financial ruin, would be the probable result of every unexpected run upon the bank by depositors to withdraw their deposits. It is the existence of conditions and contingencies of this kind likely to arise in the conduct of business that the law recognizes as the ground for raising by implication a power in corporations to borrow money and give negotiable security as a means of borrowing. And the defendant, finding these negotiable securities in the possession of the City Bank as the ostensible owner, as a

pledge for a note of the savings bank, which the City Bank apparently held under discount as business paper, had a right to act upon the assumption that the loan had been obtained and the securities had been pledged for a purpose which gave the pledge validity. *The National Bank of Republic* v. *Young, Receiver*, 14 *Stew. Eq.* 531.

The charge of the trial judge that the defendant had good title for those of the bonds in question that were pledged in connection with the Jasper and Penrose notes, and the savings bank note of December 2d, 1882, was correct.

The other transaction of the First National Bank with Boice was in the discount of two notes of $5000 each, purporting to be the notes of the savings bank, which the First National Bank discounted to the credit of the savings bank.

The first of these notes is dated December 1st, 1882, payable on demand, with interest, at the City Bank, signed by "G. S. Boice, Treasurer Fifth Ward Savings Bank," payable to his own order, and endorsed by him as treasurer. In this note it was recited that five Jersey City improvement bonds of $1000 each, Nos. 50, 51, 52, 502 and 629, were deposited with —————— as collateral, with authority to sell, &c. The second was a note dated December 5th, 1882, similar in form in all respects, and reciting that two Jersey City improvement bonds of $1000 each, Nos. 48 and 49, and three Bayonne city bonds of $1000 each, Nos. 8, 9 and 10, were deposited with ——————— as collateral security, &c.

These notes and securities did not come to the defendant's hand from a third person in the character of business paper. They were received from Boice as treasurer of the savings bank, and the discount was made to the credit of the savings bank. Having dealt with an officer of the savings bank, whose duties, as defined in the charter and by common usage, were the duties of a special agent, the defendant assumed the risk of the authority of the officer to make the notes and pledge the securities. *Black* v. *Shreve*, 2 *Beas.* 456 ; *National Iron Co.* v. *Baxter*, 4 *C. E. Green* 331.

The powers of the officers of a corporation over its business

and property are strictly the powers of agents—powers either conferred by the charter or delegated to them by the directors or managers, in whom, as the representatives of the corporation, the control of its business and property is vested. *Stokes* v. *New Jersey Pottery Co.*, 17 *Vroom* 237; *Titus & Scudder* v. *C. & F. R. R. Co.*, 8 *Vroom* 98; *S. C.*, 17 *Id.* 393, 418. The charter of the savings bank provides that the institution shall be under the management of a board of managers, who shall choose one of their number as president. The board had power to appoint a secretary, treasurer and such other officers as to it might seem necessary for conducting the business of the institution, and to make by-laws and regulations for the election of officers, and for prescribing their respective duties. The by-laws provided for the appointment of a president, vice-president, secretary and treasurer, and an auditing committee and a finance committee, the finance committee being made to consist of three managers together with the president and vice-president. The by-laws required the treasurer to deposit the funds of the institution in a bank designated by the board of managers, and provided that all checks for the purpose of investment should be drawn by the treasurer and endorsed by the president, or in his absence by the vice-president, or in the absence of both by the chairman of the finance committee. Article 10 of the by-laws defines fully and specifically the duties of the treasurer to be those of a simple accountant and custodian of the money and securities which were the property of the institution, and does not invest him with any power to raise money, dispose of securities, or borrow money.

The treasurer of a savings bank is an officer of much more limited powers than the cashier of a commercial bank. His duties more nearly resemble those of the paying and receiving tellers of banks. He cannot, simply in virtue of his office as treasurer, create obligations which shall be binding upon the bank, as by the endorsement of notes, or transfer to a purchaser a promissory note belonging to the bank. *Bradlee* v. *Warren Savings Bank*, 127 *Mass.* 107; *Commonwealth* v.

*Reading Savings Bank,* 133 *Id.* 16, 22 ; *Holden* v. *Upton,* 134 *Id.* 177 ; *Holden* v. *Phelps,* 135 *Id.* 61 ; *Torrey* v. *Dustin Monument Association,* 5 *Allen* 327. Neither by the charter nor by the by-laws was Boice, as treasurer of this institution, invested with the authority he assumed, nor was he invested with such authority *virtute officii,* by custom or usage. *Fifth Ward Savings Bank* v. *First National Bank,* 18 *Vroom* 357. In the case last cited, Chief Justice Beasley, speaking of this very officer and of the transaction now under consideration, said that " it would be truly disastrous to these valuable institutions if they cannot appoint a treasurer and deposit in his custody their moneys and securities without such situation giving rise to an inevitable inference that such official has been clothed with an unlimited capacity to contract loans and sell and pledge such securities."

There are cases in which the powers of an officer of a corporation and his authority to act for the company are enlarged beyond those powers which are inherent in his office. But those are cases in which the agency of the officer has arisen from the assent of the directors, presumed from their consent and acquiescence in permitting the officer to assume the direction and control of the business of the company. Thus, when, in the usual course of the business of a corporation, an officer has been allowed to manage its affairs, his authority to represent the corporation may be implied from the manner in which he has been permitted by the directors to transact its business. These are simply instances of the application of the principle that usual employment is evidence of the powers of an agent, and a responsibility will be laid upon the principal for the acts of his agent within the apparent authority so conferred upon the agent—a doctrine which has come to be applied to corporations in many respects as well as to individuals, and with the same qualifications and limitations. In such cases, the authority of the officer does not depend so much on his title, or on the theoretical nature of his office, as on the duties he is in the habit of performing. *Stokes* v. *New Jersey Pottery Co.,* 17 *Vroom* 237, 242 ; *Martin* v. *Webb,* 110 *U. S.*

7 ; *Commercial Ins. Co.* v. *Union Mutual,* 19 *How.* 318 ; *Mining Co.* v. *Anglo-Californian Bank,* 14 *Otto* 192 ; *Taylor on Corp.,* §§ 202, 236, 244 ; *Ang. & A. on Corp.,* §§ 229, 302.

The trial judge charged the jury that neither the charter nor the by-laws gave Boice, as treasurer, express power to borrow money and give the company's notes, and make a pledge of its securities for the payment thereof, nor was such power invested in him as treasurer, *virtute officii,* but that if Boice was held out by the managers of the company in the general course of dealing, as the agent of the company with such authority, his acts as such agent were binding upon the company ; and that question the judge submitted as a question of fact for the determination of the jury. Under these instructions, the jury found against the defendant for the bonds pledged with the last two notes, and the defendant took exceptions.

We think the judge properly directed a verdict for the defendant with respect to the bonds pledged in connection with the Jasper and Penrose notes and the savings bank note of December 2d, 1882, and that with respect to the bonds pledged in connection with the two savings bank notes of December 1st and December 5th, 1882, which were discounted by the defendant for the savings bank, the case was left to the jury under proper instructions. Neither the exceptions taken by the plaintiff nor those taken by the defendant are sustained, and the judgment should be affirmed in all respects.

DIXON, J., (dissenting.) Some of the bonds involved in this controversy were attached, as collateral, to a note purporting to have been made by one Jasper, dated July 5th, 1882, payable, with interest, *on demand,* to the order of the maker, *at the City Bank.* The note described the bonds as being attached to it as collateral. It came, with the bonds, *from the City Bank* to the First National Bank, on October 11th, 1882, for collection, and was retained by the latter bank until December 1st, 1882, without action. These circumstances make it plain to me that when the note came to the

First National Bank it was not to be regarded as immature commercial paper in which the assignee would acquire a better title than the assignor had. The note had been outstanding about one hundred days, had been in the possession of the bank in which it was payable, and was transmitted by that bank to the First National, ostensibly for collection, but of course for some other purpose, inasmuch as collection would require a return of the note to the City Bank. The banks both evidently treated the note as a mere evidence of debt, and not as commercial paper with the quality of perfect negotiability. In this condition of things the contract of the purchaser was, not that it should receive an absolute title to the debt appearing to be due on the note, but that it should receive only such a title to that debt as the vendor had. This title was void.

With regard to the bonds attached as collateral to this note, the contract of the purchaser was that it should receive them to secure its title to the debt evidenced by the note. It cannot claim to have taken them for any purpose outside of the note, because, on the face of the papers and in the assignment itself, they were annexed to it. Since, therefore, the First National Bank took no title to the note, in a transaction wherein it was notified that the apparent title might be void, its right to the bonds is equally defective, and interposed no obstacle to the title of the real owner, the Fifth Ward Savings Bank.

The court having charged that the title of the First National Bank to these bonds was valid, the judgment should be reversed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, DEPUE, PARKER, REED, VAN SYCKEL, CLEMENT, COLE, MCGREGOR, PATERSON. 11.

*For reversal*—DIXON. 1.