TOWNSHIP OF WEEHAWKEN, PLAINTIFF-RESPONDENT, v. ERIE RAILROAD COMPANY, THE FIRST NATIONAL BANK OF THE CITY OF NEW YORK, TRUSTEE, *ET AL.*, DEFENDANTS-APPELLANTS.

Argued January 16, 1956—Reargued January 23, 1956—Decided February 13, 1956.

574

Mr. *Raymond J. Lamb* argued the cause for the defendants-appellants (*Messrs. Emory, Langan & Lamb,* attorneys for all defendants-appellants other than Lincoln Parking, Inc.; *Messrs. Platoff, Platoff & Heftler,* attorneys for defendant-appellant, Lincoln Parking, Inc.).

Mr. *James Rosen* argued the cause for the plaintiff-respondent (*Messrs. Milmed & Rosen,* attorneys).

The opinion of the court was delivered by
BURLING, J.    The Township of Weehawken instituted condemnation proceedings in the Superior Court, Law Division against certain land owned by the Erie Railroad Company.    Erie, and other defendants who have leasehold and mortgage interests in the property, challenged Weehawken's right to condemn by responding to an order to

show cause. Following entry of an interlocutory judgment favoring Weehawken the defendants sought and obtained leave to appeal to the Superior Court, Appellate Division, and we certified the cause prior to an appellate review by that court.

Weehawken is located in Hudson County and has a population of some 14,500 inhabitants. It parallels the Hudson River and accommodates the New Jersey entrance to the Lincoln Tunnel.

Erie owns and operates an interstate railroad for the transportation of freight and passengers between Jersey City and Chicago, Illinois and intermediate points. It has two waterfront terminals in New Jersey, one in Jersey City which accommodates both freight and passenger traffic, and the other in Weehawken which is used solely for transshipment of freight. Erie's Weehawken terminal lies easterly of Weehawken proper, paralleling and between Hudson Boulevard (a main vehicular artery in Weehawken) and the Hudson River. The terminal is divided into two parts by the right-of-way of the New Jersey Junction Railroad which runs in a northerly and southerly direction. The easterly segment of Erie's terminal is a completely developed water port facility. The westerly segment borders Hudson Boulevard and certain portions thereof are used by Erie for the transshipment of freight from railroad cars to trucks and vice versa. Other portions are leased by Erie.

The northern portion of the westerly segment of Erie's property is proximate to the Lincoln Tunnel entrance in Weehawken. In 1938 the Port of New York Authority, in order to accommodate traffic from the upper level of the Palisades to the mouth of the Lincoln Tunnel, acquired several parcels of Erie's real estate and constructed an elevated vehicular approach to the tunnel in the shape of a helix. This structure worked to sever the westerly segment of Erie's terminal facilities, but inasmuch as the helix is elevated Erie retained the right to cross the support property with railroad tracks and thus the potential use of the property north of the helix for terminal purposes was not de-

stroyed. The tract thus severed is bordered on the east and south by the semi-circular sweep of the elevated helix, on the west by Hudson Boulevard, and on the north by land of Erie presently under condemnation to the Port of New York Authority for an administration building. It has an area of approximately five acres. The Pennsylvania Railroad Company owns a rectangular plot extending from the easterly border to the center of the tract which is used as a tunnel shaft. The land lying to the north of a line running from the Pennsylvania Railroad's tunnel shaft west to Hudson Boulevard has been designated as Parcel B by the parties. The land lying to the south of this line has been termed Parcel A. Weehawken seeks to acquire both parcels.

By virtue of the construction of the third tube of the Lincoln Tunnel Weehawken is losing certain recreational facilities. A controversy between Weehawken and the Port of New York Authority was apparently engendered by this loss, resulting in an agreement whereby Weehawken was to acquire Parcels A and B from Erie by purchase or condemnation for recreational and parking facilities and the Port Authority would sustain the cost of the project. This understanding was reached in October of 1953.

Prior to this time, and in January 1953, Erie commenced negotiations with a trucking firm concerning the economic feasibility of constructing a facility whereby newsprint and other merchandise might be transshipped from Erie's railroad cars, loaded into trucks and expeditiously carried into New York city via the Lincoln Tunnel. It is sufficient at this time to state that by August 1953 these discussions materialized to the point that Parcels A and B were selected to accommodate the proposed facility.

In January 1954 Erie learned of Weehawken's plans. A conference between municipal and railroad representatives took place. Erie was of the opinion that the land in question would suffice both the railroad's design and that of Weehawken, but the township considered the entirety to be required for municipal purposes. Although it appears

that Erie was prepared to construct the facility its officials decided to postpone any steps in that direction until the entire matter might be determined pursuant to a condemnation proceeding.

Weehawken, having failed to acquire the tract by purchase, instituted the anticipated action in the fall of 1954. Seeking to acquire Parcel A for a Little League baseball field and grandstand and several other recreational facilities, it invoked the statutory authority of *R. S.* 40:61–1. The design for Parcel B was a parking area which would accommodate the automobile parking requirements of those attending the recreational area and in addition would serve residents and nonresidents who parked their automobiles in Weehawken and used bus transportation to reach New York City. Authority for this acquisition was grounded in *R. S.* 40:60–25.1. The condemnation proceeding was instituted pursuant to the procedural provisions of *R. S.* 20:1–1 *et seq.*

Erie resisted the municipal acquisition upon two grounds—first, because Parcels A and B are being held for a public use and hence are not subject to acquisition under a general power of condemnation, and secondly, that appropriation of Parcel B for a municipal parking facility under *R. S.* 40:60–25.1 would work a deprivation of property repugnant to constitutional safeguards because no traffic problem existed in that particular area. These two issues are presented on appeal.

The trial court recognized the rule laid down in *New Jersey Southern Railroad Company v. Long Branch Commissioners*, 39 *N. J. L.* 28 (*Sup. Ct.* 1876), that property previously devoted to a public use may not be taken under the power of eminent domain unless the authority to do so is given in express terms or arises from a necessary implication. It found, however, that the proposed use of the land by Erie was not necessary nor requisite in the exercise of its franchise, that Parcels A and B are not now devoted to a public use and any future use was based only upon conjecture or contingencies. In brief, the planning of the proposed use lacked

the firmness and conviction which would lead to its manifestation within the reasonably foreseeable future, and in any event the operation was a voluntary assumption on Erie's part, unnecessary in its service to the public. The immunity was thus held non-existent to the property in question.

██ The doctrine of prior use is well recognized. See cases cited at 1 Nichols on Eminent Domain (*3rd ed.* 1950), *sec.* 2.2. Simply stated, the rule denies exercise of the power of condemnation where the proposed use will destroy an existing public use or prevent a proposed public use unless the authority to do so has been expressly given by the Legislature or must necessarily be implied. *Ibid; Village of Ridgewood v. Borough of Glen Rock,* 15 *N. J. Misc.* 65 (*Sup. Ct.* 1936). The principle is applicable, for example, to municipal condemnation of railroad lands, *New Jersey Southern Railroad Company v. Long Branch Commissioners, supra;* railroad condemnation of municipal lands, *State, the Mayor and Aldermen of Jersey City v. Montclair Railway Company,* 35 *N. J. L.* 328 (*Sup. Ct.* 1872), and municipal acquisition of lands of another municipality, *Village of Ridgewood v. Borough of Glen Rock, supra,* but it has no place where the condemnor is, in essence, the sovereign, either federal or state. *State Highway Comm. v. City of Elizabeth,* 102 *N. J. Eq.* 221 (*Ch.* 1928), affirmed 103 *N. J. Eq.* 376 (*E. & A.* 1928). See *United States v. Carmack,* 329 *U. S.* 230, 67 *S. Ct.* 252, 91 *L. Ed.* 209 (1946). The rule stems from the recognition that municipal and many private corporations possess general powers of condemnation delegated by the Legislature. If one such body may acquire land used or held for a public purpose by another corporation under a general power of condemnation, the latter would logically be free to reacquire the same property. *Village of Ridgewood v. Borough of Glen Rock, supra,* 15 *N. J. Misc.,* at *p.* 67. By like token it is recognized that if there were no exception to the rule the Legislature would be required in every instance of conflict between an existing public use and a proposed public use to enact special legislation. (This problem appears to have been recognized, although not discussed,

in the early case of *The Attorney General ex rel. Pattee v. Stevens,* 1 *N. J. Eq.* 369, 383–384 (*Ch.* 1831). And see *Ball, Intergovernmental Conflicts in Land Acquisition: Adjustment for Maximum Public Benefit,* 10 *Ohio State L. J.* 30, 33 (1949)). So, if the power to condemn a public use may be "necessarily implied" from the statutory authority, it may be exercised. 11 *McQuillin on Municipal Corporations* (*3d ed.* 1950), *sec.* 32.67. Whatever may be the range of factual circumstances upon which the power may be "necessarily implied," it is apparent that a comparative evaluation of the proposed and existing use in terms of public benefit becomes a subject of judicial indulgence to a greater or less degree. See, *e. g., New York & L. B. R. Co. v. Drummond,* 46 *N. J. L.* 644 (*E. & A.* 1884) ; *State, The Mayor and Aldermen of Jersey City v. Montclair Railway Company, supra.* Some courts have held the implication may only arise from facts which demonstrate that an exercise of the power is necessary to realize enjoyment of the privilege bestowed, *Minnesota Power & Light Co. v. State,* 177 *Minn.* 343, 225 *N. W.* 164 (*Sup. Ct.* 1929) ; *Rutland-Canadian R. Co. v. Central Vermont R. Co.,* 72 *Vt.* 128, 47 *A.* 399 (*Sup. Ct.* 1900), while others speak in terms of reasonable necessity and comparative value of the conflicting interests. *City and County of Denver v. Board of Commissioners of Arapahoe County,* 113 *Colo.* 150, 156 *P. 2d* 101 (*Sup. Ct.* 1945) ; *Fry v. Jackson,* 264 *S. W.* 612 (*Tex. Civ. App.* 1924) ; *City of Tacoma v. Nisqually Power Co.,* 57 *Wash.* 420, 107 *P.* 199 (*Sup. Ct.* 1910). The latter approach has received impetus from 2 *Lewis, Eminent Domain* (*3d ed.* 1909), where the author states at *sec.* 440:

"As to the degree of necessity which must exist * * * the better opinion is that it must be a reasonable one. Whether any general rule can be laid down as to what will constitute a reasonable necessity, may be doubted. But we should say that there was a reasonable necessity for the taking where the public interests would be better subserved thereby, or where the advantages to the condemnor will largely exceed the disadvantages to the condemnee."

The suggested rationale was cited and approved in *State Highway Comm. v. City of Elizabeth, supra,* 102 *N. J. Eq.,*

at 224, and *Bergen County Sewer Authority v. Borough of Little Ferry*, 7 *N. J. Super.* 213, 218–219 (*App. Div.* 1950) appeal dismissed, 5 *N. J.* 548 (1950), but was not decisive in either case.

The statutory authority invoked by Weehawken to acquire Parcels A and B is couched in general terms so far as the power of eminent domain is concerned. Under *R. S.* 40:61–1 a municipality may acquire by "gift, devise, purchase or condemnation" any improved or unimproved real estate within or without its boundaries for parks and recreational facilities. *R. S.* 40:60–25.1, providing for acquisition of property for the public parking of vehicles, is equally general in terms of the condemnation power. In the pretrial order Weehawken additionally relied upon *R. S.* 40:60–2, which also delegates a general power of condemnation upon municipalities which may be exercised to accomplish the purpose of other powers bestowed by law.

Two essential issues are thus presented upon the doctrine of prior use as applied to the facts of this case:

1. Was the proposed railroad use of the property public in nature and intended to come into fruition within a reasonably foreseeable time?
2. If the first question be answered affirmatively, then may Weehawken's power to condemn Parcels A and B rest upon a necessary implication arising from the statutes which have been invoked?

■■ We are prone to disagree with the learned trial court that Erie's design for a portion of this property was not a public use. Erie occupies the status of a common carrier. It is bound to accommodate all freight and passenger traffic which seek its service. *Messenger v. Pennsylvania Railroad Company*, 37 *N. J. L.* 531 (*E. & A.* 1874) ; *Atwater v. Delaware, Lackawana & W. R. Co.*, 48 *N. J. L.* 55 (*Sup. Ct.* 1886). *Cf. Bogert v. Hackensack Water Co.*, 3 *N. J. Misc.* 107 (*Sup. Ct.* 1925), affirmed 101 *N. J. L.* 518 (*E. & A.* 1925). Receiving and terminal facilities are necessary adjuncts to the service rendered. *State v. Commissioners of Mansfield*, 23 *N. J. L.* 510, 513–514 (*Sup. Ct.*

1852). Erie's plans call for the construction of trackage and a loading platform upon a portion of the property in dispute. Railroad cars would be delivered to one side of the platform and their contents emptied into large trucks which would then deliver the freight to points of consignment in New York City. Erie has no through route to this metropolis. If it is to serve the public in this respect an alternate means of transportation must be utilized. The transportation of freight constitutes a public franchise, *Vollick v. Lehigh Valley R. Co.,* 104 *N. J. L.* 283, 285 (*Sup. Ct.* 1928), and the proposed facility is a necessary implement. The public use thus manifested is not diluted because the facility may only be enjoyed by a portion of the public, *Vollick v. Lehigh Valley R. Co., supra,* 104 *N. J. L.,* at 285, 286; *DeCamp v. Hibernia Underground Railroad Company,* 47 *N. J. L.* 43 (*Sup. Ct.* 1885), affirmed 47 *N. J. L.* 518 (*E. & A.* 1885); Erie is bound to extend the service to all who have reasonable need for the proposed facility depending upon its capacity for transshipment of freight. Railroad franchises should not be so strictly construed as to disallow growth and progress to meet the competitive forces of the time.

Nor do we think the proposed railroad use was based upon conjecture. Indeed, it is said that but for the threat of condemnation by Weehawken the facility would have been constructed and will be developed pending a favorable outcome in this litigation. Although the improvement was motivated by a desire to handle newsprint for New York City newspapers, it could also be used for other merchandise. An assistant vice-president of Erie in charge of its traffic department testified that motor carrier transportation constituted the gravest competitive threat to Erie, that the contemplated facility would work an increased volume in its business, and that a present need existed. Although Erie had no express contract with the local motor carrier intended to transport the freight from the proposed facility to New York City, it evidently felt the expense of the improvement was sufficiently justified in view of the prospective business which might thereby be attracted.

■■ The fact that Erie's board of directors had passed no resolution authorizing the installation, or that the plans and specifications were not filed with the proper public authorities, although relevant, is not decisive. The prior use doctrine applies to land held by a corporation to accommodate reasonably foreseeable future demands, *Village of Ridgewood v. Borough of Glen Rock, supra; Vermont Hydro-Electric Corp. v. Dunn,* 95 *Vt.* 144, 112 *A.* 223, 12 *A. L. R.* 1495 (*Sup. Ct.* 1921), although a mere naked possibility that it will be so used will not immunize it from condemnation under a general power. 1 *Nichols, supra, sec.* 2.2(4). In *New Haven Water Co. v. Borough of Wallingford,* 72 *Conn.* 293, 44 *A.* 235, 239 (*Sup. Ct.* 1899), the court said:

"* * * there must be an actual intent to take presently or in the near future, and that intent must be manifested and carried out by apt and suitable acts."

It is clear from the record before us that Erie intended to appropriate a portion of the property in question hereinafter referred to for railroad purposes, not merely in the reasonably foreseeable future nor near future, but presently.

Weehawken places great emphasis upon the fact that portions of the lands in dispute in the past have been leased by Erie for other than railroad purposes, and are presently being taxed as property owned by a railroad not used for railroad purposes. Defendant Lincoln Parking, Inc. is presently using portions of Parcels A and B as a parking lot. The present lease to Lincoln may be cancelled by Erie upon ten days' notice. Prior leases to Lincoln were cancellable on 90 days' notice. The brief period in which enjoyment might be recaptured is indicative that this use was only of temporary design, fully subject to conversion to railroad uses at any time. A reclassification on the tax rolls as Class II property would undoubtedly follow. Nor do the several sales of realty by Erie fronting on Hudson Boulevard to industrial uses detract from the railroad's present purpose to devote Parcels A and B to a freight facility. The present demand is responsive to present need, a factor possibly not

visualized by Erie's management when other property was sold, or ill-suited to fulfill the present mission. If Erie is to be held to the greater wisdom reflected by hindsight, then Weehawken, too, might properly have asserted its program for Parcels A and B at an earlier date. We are told that "Weehawken's need for all the subject property became apparent in the early part of 1953," yet it was not until the latter part of January of 1954 that Erie had such knowledge, and as early as August 24, 1953 it had determined through the acceptance of the local trucking concern, that Parcels A and B would be the most advantageous location for the freight facility.

Erie officials testified that there was no other land suitable for the construction of the facility except a parcel in Jersey City which is less than a mile from the Holland Tunnel. The local trucking concern was interested in a Weehawken facility, however, and as the initial success of the venture hinged largely upon that organization Erie was prone to regard its desires in the matter. Witnesses for both Erie and the trucking concern testified that time is a highly competitive factor, and Parcels A and B, being situated practically at the mouth of the Lincoln Tunnel entrance, were most advantageous in this regard.

During the course of the trial below counsel for Weehawken questioned Mayor Charles F. Krause, Jr. as to the availability of other land within Weehawken which could be condemned to accommodate the project. Objection to this line of questioning was entered by counsel for Erie and defendant Lincoln Parking, Inc., and sustained by the court below. The basis for the court's ruling and the fact that no error in this regard has been urged on the appeal is understandable when one considers the theory upon which Weehawken presented its case. It was argued below and is argued here that Weehawken, having the power of condemnation to achieve the intended purpose, has complete discretion in determining the quantity and location of the property to be acquired, *City of Trenton v. Lenzner,* 16 *N. J.* 465 (1954), *certiorari* denied 348 *U. S.* 972, 75 *S. Ct.* 534, 99 *L. Ed.* 757

(1955), and the exercise thereof will not be disturbed absent an abuse of the power. See *Burnett v. Abbott,* 14 *N. J.* 291, 295 (1954). While this is the judicial· approach to the exercise of the eminent domain power, it is not applicable where the doctrine of prior use comes into play. This must necessarily be if we are to avoid the very consequences which would arise if a prior public use might be condemned under a general power. *Village of Ridgewood v. Borough of Glen Rock, supra.*

■ Weehawken does enjoy a measure of flexibility in locating its municipal facilities upon property not now devoted nor intended to be devoted to a public use. Unlike railroad facilities, it is not essential that a playground be near at hand to the main line of a railroad nor in proximity to a major avenue of highway transportation. To Erie, however, this combination of factors constitutes a most important criterion and a major asset. And although the public benefit to be derived from a recreational area may not be minimized, it tends to lose proportion where the project would exclude a railroad operation for which the property is so highly adaptable.

■ We find, contrary to the determination below, that the intended use by Erie of the portion of the property hereinafter described is a public railroad use and that it is sufficiently imminent to deny an exercise of the condemnation power to the extent contended for by Weehawken.

Prior to this condemnation proceeding and during the trial of the cause Erie offered to convey to Weehawken that portion of Parcels A and B which it did not need for the facility in question. This offering appears to be demonstrated on Exhibit DE–8 and would comprise, approximately, 13,346 square feet of Parcel A and 72,595 square feet of Parcel B. The latter plot would have a 150-foot frontage on Hudson Boulevard. Erie would retain the westerly portions of Parcels A and B, bounded on the south by the helix and on the north by Baldwin Avenue as now located. Weehawken has not refuted Erie's argument that the offering

would accommodate their plan for recreational facilities and incidental parking requirements, but it objected that Parcel A would be landlocked. This situation results from that parcel being hemmed on the north by the Pennsylvania Railroad Company's tunnel shaft, on the west by Erie's proposed improvement, and on the south and east by Port Authority property supporting the helix.

We conclude that Weehawken may condemn that portion of Parcels A and B mentioned in the preceding paragraph for recreational and parking facilities because by the very admission of Erie it is not now intended nor anticipated to be used for railroad purposes. *Bergen County Sewer Authority v. Borough of Little Ferry, supra.* The municipality has the power under *R. S.* 40:60–25.1 to construct a parking lot to accommodate the persons who may fairly be anticipated to attend the recreational area and Little League events. An off-street parking area incidental to the sporting area may be as much needed as one in the business area. One municipal official testified that a parking problem is presented when athletic activities are in progress at the high school stadium which is located over the entrance to the Lincoln Tunnel. To the extent condemnation is permissible here, we accord the municipality a wide degree of discretion. *City of Trenton v. Lenzner, supra.* And see *Town of Bloomfield v. New Jersey Highway Authority,* 18 *N. J.* 237, 245–246 (1955).

To overcome the problem of ingress and egress to Parcel A upon the part of the municipality, further condemnation is permitted to enable Weehawken to obtain a strip of land sufficient to accommodate a corridor adjacent to and westerly of the Pennsylvania Railroad Company's tunnel shaft, thus connecting Parcels A and B. The precise measurement of this corridor may be determined by agreement or subsequent court proceedings in this cause. The slight infringement which this passageway would have upon Erie's use of the property desired to be retained for a freight facility is insubstantial to the public benefit which Weehawken may seek to realize, *New York & L. B. R. Co.*

*v. Drummond, supra,* and appears not to hamper the desired railroad use (Exhibit DE–8).

The judgment is modified in accordance with this opinion and the cause remanded for further proceedings in accordance therewith.

No costs will be taxed to any party.

*For modification*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT and BURLING—4.

*For affirmance*—Justices WACHENFELD, JACOBS and BRENNAN—3.