35 A.3d 726

NORFOLK SOUTHERN RAILWAY COMPANY, A VIRGINIA CORPORATION, PETITIONER–RESPONDENT, v. INTERMODAL PROPERTIES, L.L.C.,[1] RESPONDENT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued October 25, 2011—Decided February 9, 2012.

---

[1] Intermodal Properties, L.L.C. was erroneously identified as Interstate Intermodal, Inc. in the petition filed in this matter.

110

Before Judges YANNOTTI, ESPINOSA and KENNEDY.

*Eric D. McCullough* argued the cause for appellant (*Waters, McPherson, McNeill, P.C.,* attorneys; *James P. Dugan* and *Mr. McCullough,* of counsel; *Mr. McCullough,* on the brief).

*Alan P. Fox* argued the cause for respondent (*Capehart & Scatchard, P.A.,* attorneys; *John K. Fiorilla,* of counsel; *Mr. Fox* and *Mary Ellen Rose,* on the brief).

*Paula T. Dow,* Attorney General, attorney for Commissioner of Transportation (*Laura Eytan,* Deputy Attorney General, on the statement in lieu of brief).

The opinion of the court was delivered by

YANNOTTI, J.A.D.

Intermodal Properties, L.L.C. (Intermodal) appeals from a final determination of the New Jersey Department of Transportation (NJDOT) authorizing Norfolk Southern Railway (Norfolk) to condemn Intermodal's property in Secaucus, New Jersey. For the reasons that follow, we reverse and remand the matter to the Office of Administrative Law (OAL) for further proceedings.

## I.

Norfolk is the owner of between 240 and 275 acres of land in Secaucus, upon which Norfolk operates an intermodal freight facility known as Croxton Yard. Intermodal traffic generally involves two or more types of transportation. At an intermodal rail facility, goods are transported by ship or truck to a railhead for movement on rail cars. At Croxton Yard, containers containing goods are loaded upon or removed from rail cars.

There are five rail tracks at Croxton Yard for loading and unloading containers, along with five loading pads, a storage track, a running track, an engine track and a track used for rail car repairs. The railroad and the contractor that loads and unloads the freight have offices on the property. There are three trailer maintenance buildings at the yard.

In 2007, there were an estimated 18,000 lifts (the loading and unloading of containers) per month at Croxton Yard. The traffic at the yard comes from New York and New Jersey ports, trains and trucks. The freight coming into the yard is shipped to locations in New York, New Jersey and New England.

Intermodal owns 5.88 acres of property in Secaucus, which are adjacent to Norfolk's property. Intermodal's property contains a building of about 80,000 square feet that had been used as a freight-forwarding facility, and is presently being used for truck parking and container storage. In 2004 and 2005, Norfolk made several offers to purchase the property but Intermodal rejected the offers. On October 31, 2005, Norfolk filed a petition with the NJDOT pursuant to *N.J.S.A.* 48:3–17.6 and *N.J.S.A.* 48:12–35.1, for authorization to acquire Intermodal's property through the exercise of the power of eminent domain.

*N.J.S.A.* 48:3–17.6 provides that railroads and other public utilities may take or acquire property by condemnation. *N.J.S.A.* 48:3–17.7 states that a public utility may not exercise this condemnation power unless the applicable regulatory authority finds

that the land or other property or interest therein desired is reasonably necessary for the service, accommodation, convenience or safety of the public, and that the taking of such land or other property or interest therein is not incompatible with the public interest and would not unduly injure the owners of private property.

In addition, *N.J.S.A.* 48:12–35.1 establishes additional conditions for the condemnation of property by railroads. Among other things the statute states that a railroad may take land by condemnation "as exigencies of business may demand[.]"

On August 10, 2006, the NJDOT referred Norfolk's petition to the OAL for a hearing. On March 20, 2007, the ALJ issued a prehearing decision on several issues. The ALJ noted that Intermodal wanted to present evidence to show that use of its property as a parking lot for the Secaucus Junction rail passenger station would be more compatible with the public interest than use of the property for intermodal freight operations.

The ALJ determined that Intermodal would not be permitted to present this evidence. The ALJ stated that Norfolk's proposed use of the property was for a recognized public purpose. She noted that railroads serve a public purpose and have been declared by statute to be public utilities. Moreover, Intermodal had not shown that it could use the property as a parking lot for the railroad station.

The ALJ noted that the Intermodal property was not then zoned for use as a parking garage, and there was no indication that the property would be rezoned for that use in the future. The ALJ also pointed out that no State or local government agency had expressed a willingness to enter into a contract with Intermodal to provide public parking on the site.

In the March 22, 2007 opinion, the ALJ additionally addressed the provision in *N.J.S.A.* 48:12–35.1, which states that a railroad may only take property by condemnation "as exigencies of business may demand[.]" The ALJ determined that this statutory provision did not limit the exercise of the condemnation power to emergency situations, as Intermodal had argued. The ALJ interpreted the statute to allow a railroad to condemn property as the needs of its business reasonably demand.

In addition, the ALJ addressed the question of whether Norfolk or Intermodal would have the burden of proof on the issue of whether the taking of the property would "unduly injure" Intermodal. The ALJ stated that Intermodal should bear the burden of proof because it had the relevant information on this issue.

After the ALJ's decision, amendments to *N.J.S.A.* 48:12–35.1 were enacted into law, which became effective on January 13, 2008. *L.* 2007, *c.* 290, § 1. As amended, *N.J.S.A.* 48:12–35.1 states that a railroad seeking authorization to condemn also must establish that

alternative property suitable for the specific proposed use of the property to be taken is unavailable, either through on-site accommodation or through voluntary sale of alternative, reasonably situated property, and that the interest in the property to be taken does not exceed what is necessary for the proposed use, and shall also demonstrate to the Department of Transportation at an informal hearing the specific use to be made of the land or other property or interest to be acquired and that such proposed use is necessary and consistent with the purposes enumerated for such railroad utility and with the extent of the land or other property or interest to be condemned; . . . .

Thereafter, Norfolk filed a motion and argued, among other things, that the amendments to *N.J.S.A.* 48:12–35.1 were preempted by the Interstate Commerce Commission Termination Act of 1995 (ICCTA), specifically 49 *U.S.C.A.* § 10501(b), which grants the Surface Transportation Board (STB) regulatory authority over the operations of rail carriers. The ALJ issued a decision dated May 14, 2008, in which she determined that federal law preempted the "requirement that a railroad utility show that alternative on-site accommodations are unavailable" because this statutory provision "directly regulates railroad transportation." The ALJ concluded, however, that the other statutory requirements were not preempted.

Following the evidentiary hearings, the ALJ issued a decision dated December 11, 2009, authorizing Norfolk to commence condemnation proceedings to acquire Intermodal's property. The ALJ found that Norfolk had established all of the criteria for condemnation under *N.J.S.A.* 48:3–17.7 and *N.J.S.A.* 48:12–35.1.

The Commissioner of the NJDOT did not issue a decision accepting or rejecting the ALJ's decision within forty-five days after its issuance. Therefore, the ALJ's decision became the final decision in the matter pursuant to *N.J.S.A.* 52:14B–10(c). This appeal followed.

## II.

■ We turn first to Intermodal's contention that the ALJ erred by finding that the taking of its property was "not incompatible with the public interest," as required by *N.J.S.A.* 48:3–17.7.

■ "Appellate review of an agency's determination is limited in scope." *Circus Liquors, Inc. v. Governing Body of Middletown, Twp.*, 199 *N.J.* 1, 9, 970 *A.*2d 347 (2009). In reviewing an agency's decision, we consider

(1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[*Id.* at 10, 970 *A.*2d 347 (citing *Mazza v. Bd. of Trs.*, 143 *N.J.* 22, 25, 667 *A.*2d 1052 (1995)).]

In her decision on December 11, 2009, the ALJ noted that Susan S. Gruel (Gruel), a licensed planner in this State, had testified that condemnation of Intermodal's property would be compatible with the objectives of the Meadowlands Master Plan, which identified the Meadowlands as a prime location for the expansion of intermodal facilities. Gruel stated that Norfolk's proposed use of the property also was consistent with the Hudson County Master Plan of 2002, which recommended, among other things, public investment in rail infrastructure to expand the capacity of intermodal traffic and reduce truck traffic on the State's roads.

Gruel additionally testified that a Regional Transportation Plan for North Jersey prepared by the New Jersey Turnpike Authority (NJTA) indicated that intermodal rail freight traffic will grow

three to four times by 2030, and there will be a doubling of non-container freight traffic by that time. The NJTA plan noted there was a need to reduce reliance on trucks to move freight and to increase rail capacity. The plan stated that freight, trucking, and warehouse facilities should be located near rail centers to prevent freight sprawl. Gruel testified that the taking of the Intermodal property would be consistent with this study because the expanded Croxton Yard is near the Turnpike and in close proximity to port facilities.

Gruel also testified that the taking of the Intermodal property for use in Norfolk's intermodal operations would be consistent with a NJDOT study called "Portway," which recommends enhanced access to port, rail and warehouse facilities and the utilization of existing rail and roadways to maximize the movement of freight. Moreover, Gruel said that the taking would be consistent with the objectives of the NJDOT's 2008 Update Report of the State Rail Planning Process, which recommends the further development of rail service to save energy and mitigate highway congestion.

In her decision, the ALJ additionally noted that Norfolk had presented testimony from Maureen Severini (Severini), the hub manager for Croxton Yard, and Robert Silk (Silk), Norfolk's group manager of service and assets in its intermodal business. Severini and Silk testified that expanding Croxton Yard would reduce "dwell time," which is the amount of time trucks are on site awaiting cargo. The ALJ stated that, aside from making the railroad more efficient, the taking "would have the public benefit of reducing the amount of time that trucks [are] on the road and naturally lessen the amount of pollutants that they emit into the air."

The ALJ also noted that Norfolk had presented testimony regarding its proposed Crescent Corridor project, which is expected to expand the railroad's freight operations from the northeast to the southern United States and eventually into Texas and Mexico. The goal of the Crescent Corridor project is to increase

the railroad's freight business, thereby reducing highway congestion from truck traffic. Croxton Yard will be the northern terminus of the corridor. The project is expected to bring seven new trains per day into Croxton Yard, which will substantially increase the number of containers being loaded and off-loaded there.

The ALJ found the expansion of Croxton Yard to accommodate additional parking of intermodal equipment was consistent with the purposes of the Meadowlands Master Plan and other planning documents, "which demonstrate that state and local government entities are encouraging the development of alternatives to truck traffic to reduce traffic congestion and air emissions." The ALJ stated that the expansion of the yard would complement the purposes of the studies by moving "traffic off the roads."

The ALJ further found that, if implemented, the Crescent Corridor project "would also help alleviate congestion on the highways." The ALJ stated that adding the Intermodal property to the yard would increase the railroad's efficiency, reduce the amount of time trucks are on the roads and "lessen the amount of pollutants that they emit into the air." We are satisfied that there is sufficient credible evidence in the record to support the ALJ's findings.

■ Intermodal argues, however, that the ALJ erred by refusing to permit it to present evidence showing that use of the property as a commuter parking lot would be of greater benefit to the public than use of the property for intermodal freight operations. We do not agree.

The ALJ found that Norfolk's proposed use of the property as a rail freight facility is for a public purpose. The ALJ's finding is consistent with the well established understanding that railroads serve a public purpose. *Twp. of Weehawken v. Erie R.R. Co.*, 20 *N.J.* 572, 581–82, 120 *A.*2d 593 (1956). Indeed, the Legislature has declared that railroads are public utilities and conferred upon them the power to take property by condemnation. *N.J.S.A.* 48:3–17.6. Furthermore, at the time Norfolk filed its petition,

Intermodal was not using the property for a public purpose. At that time, the property was not zoned for use as a commuter parking lot.

Although the New Jersey Meadowlands Commission (NJMC) later rezoned the property so that it could be used for a commuter parking lot, Intermodal did not seek that zoning change until May of 2006. Moreover, there was no evidence indicating that any State or local entity was willing to enter into an agreement with Intermodal to develop the property as a commuter parking lot.

 In addition, the ALJ also correctly determined that Intermodal could not invoke the public use doctrine. That doctrine precludes the "exercise of the power of condemnation where the proposed use will destroy an existing public use or prevent a proposed public use unless the authority to do so has been expressly given by the Legislature or must necessarily be implied." *Id.* at 579, 120 *A.*2d 593.

The public use doctrine did not apply here. The doctrine did not apply because Intermodal was not using the property for a public purpose at the time Norfolk filed its petition, the property was not zoned at that time for use as a commuter parking lot, and despite the subsequent zoning change, development of the property as a commuter parking lot was speculative, at best.

 Intermodal further argues that the doctrines of collateral estoppel and res judicata precluded Norfolk from asserting that the taking of the property for use in its intermodal freight business was not "incompatible with the public interest." Again, we disagree.

 Res judicata precludes the relitigation of claims or issues that have already been adjudicated. *Velasquez v. Franz,* 123 *N.J.* 498, 505, 589 *A.*2d 143 (1991). In addition, collateral estoppel " 'bars relitigation of *any issue* which was actually determined in a prior action, generally between the same parties, involving a different claim or cause of action.' " *Tarus v. Borough of Pine*

*Hill,* 189 *N.J.* 497, 520, 916 *A.*2d 1036 (2007) (quoting *Sacharow v. Sacharow,* 177 *N.J.* 62, 76, 826 *A.*2d 710 (2003)).

As we noted previously, after Norfolk commenced this action, the NJMC rezoned the property, thereby allowing it to be used as a commuter parking lot. Norfolk appealed from the NJMC's determination and, in an unpublished opinion, we affirmed the zoning change. *In re N.J. Meadowlands Comm'n Resolution No. 08-30,* No. A-4697-07 (App.Div. July 6, 2009) (slip op. at 6), *certif. denied,* 200 *N.J.* 475, 983 *A.*2d 200 (2009).

However, in our decision, we did not address the specific question raised here, which is whether the taking of Intermodal's property would be compatible with the public interest. Therefore, the doctrines of res judicata and collateral estoppel do not preclude Norfolk from litigating that issue in this case.

### III.

■ Intermodal next argues that the ALJ erred in her interpretation of the provision of *N.J.S.A.* 48:12-35.1, which permits a railroad to condemn property as "exigencies of business may demand." As we stated previously, the ALJ determined that this statutory phrase should be interpreted in accordance with one of the dictionary definitions of "exigency," specifically "the need, demand, or requirement intrinsic to a circumstance, [or] condition" such as "the exigencies of city life[.]" *Random House Unabridged Dictionary* (2006).

Intermodal argues that *N.J.S.A.* 48:12-35.1 should be interpreted to preclude a railroad from taking private property by condemnation except to address an urgent or emergency situation. We disagree.

Our goal in statutory interpretation " 'is to determine and effectuate the Legislature's intent.' " *Hubner v. Spring Valley Equestrian Ctr.,* 203 *N.J.* 184, 193–94, 1 *A.*3d 618 (2010) (quoting *Bosland v. Warnock Dodge, Inc.,* 197 *N.J.* 543, 553, 964 *A.*2d 741 (2009)). " '[W]e look first to the plain language of the statute,

seeking further guidance only to the extent that the Legislature's intent cannot be derived from the words that it has chosen.'" *Id.* at 194, 1 *A.*3d 618 (quoting *Pizzullo v. N.J. Mfrs. Ins. Co.,* 196 *N.J.* 251, 264, 952 *A.*2d 1077 (2008)).

We are convinced that the Legislature did not intend to limit the exercise of the condemnation power in *N.J.S.A.* 48:12–35.1 to emergency situations, as Intermodal maintains. In our judgment, the ALJ correctly interpreted the statute to mean that a railroad may take private property by the exercise of the power of eminent domain as the needs of its business may reasonably demand. That interpretation is consistent with one of the ordinary meanings of the word "exigency."

Furthermore, this interpretation makes the most sense, when considered " 'from a view of the entire statute.'" *Hubner, supra,* 203 *N.J.* at 195, 1 *A.*3d 618 (quoting *Febbi v. Bd. of Review,* 35 *N.J.* 601, 606, 174 *A.*2d 481 (1961)). The statute establishes various requirements that a railroad must meet in order to obtain authorization to condemn private property. The authorization process, as shown here, can take a considerable period of time. The lengthy nature of this process indicates that the Legislature did not intend that a railroad could only condemn private property to address an emergent or urgent need for additional property.

Furthermore, a railroad's decision to acquire property to expand existing facilities is more often than not the result of long-term planning. We are therefore convinced that the Legislature intended to authorize a railroad to acquire property by condemnation as the reasonable needs of its business demand, not simply to address an urgent or emergent need for additional property.

█ Intermodal further argues that the ALJ erroneously found that Norfolk satisfied the statutory "exigencies of business" standard. Again, we disagree.

As the ALJ explained in her December 11, 2009 decision, Norfolk established that intermodal freight business is likely to increase in the future, despite the current economic recession.

Although the capacity of Croxton Yard may be sufficient to meet Norfolk's present needs, the railroad established that its need for additional space at the yard will exceed its current capacity in the foreseeable future, particularly in view of the anticipated implementation of the Crescent Corridor project.

We are therefore satisfied that there is sufficient credible evidence in the record to support the ALJ's finding that the reasonable needs of Norfolk's business demand the acquisition of the Intermodal property.

## IV.

We next consider Intermodal's contention that there is insufficient evidence in the record for the ALJ's finding that alternative off-site properties are not available for the proposed use of Intermodal property.

Here, the ALJ reviewed each of the sites identified as potential off-site alternatives, and found that none were suitable for the specific use proposed by Norfolk. In reaching that decision, the ALJ noted that Norfolk retained Paul W. Korch (Korch), a licensed appraiser, to do a study of alternative sites for the expansion of Croxton Yard. Korch focused on properties of six acres or larger in proximity to the yard, as of the date when Norfolk filed its condemnation petition.

Korch considered properties within one mile of Croxton Yard that were under single ownership. He also considered a variety of factors including the geographic locations of the properties, nearby roadways, traffic patterns, zoning restrictions and existing uses. Korch identified fifteen properties that met these criteria. He eliminated twelve of the properties for various reasons and said that three might be suitable. Korch did not, however, address operational considerations applicable to those properties.

Gruel compared the fifteen alternative sites to the Intermodal property. She noted that the Intermodal property was adjacent to Croxton Yard and could easily be incorporated into the yard.

She stated that security could be provided on the Intermodal property without any difficulties, and there would be no need to use the area's roads to gain access to the property. Gruel also said that there would be no increase in traffic to and from the yard, and no added burden on its infrastructure. Gruel stated that the Intermodal property was a good location, from an efficiency point of view and from a planning and land use perspective.

Severini testified that the Intermodal property was the most suitable for expansion of Croxton Yard. It was located within a quarter mile of the yard's loading tracks and was accessible. In addition, Malcolm Roop (Roop), senior manager in Norfolk's real estate department, stated that condemnation of the Intermodal property would allow the railroad to use about two and one-half acres of vacant land that it owned, which are located immediately north and adjacent to the Intermodal property. Roop explained that this property was not being used because of access problems.

The ALJ concluded that Norfolk had "demonstrated that there [was] no alternative property suitable for the specific proposed use for intermodal parking that is reasonably situated" to Croxton Yard. The ALJ stated that "[t]he statute does not require the railroad to purchase any property, whether it is suitable or not, simply because [Intermodal] does not wish to sell [the] property." The ALJ additionally stated that the Intermodal property was "particularly suitable" for Norfolk's needs given its location adjacent to Croxton Yard. We are satisfied that there is sufficient credible evidence in the record to support the ALJ's findings.

V.

Intermodal also contends that the ALJ erred by finding that Norfolk established that it was not seeking to acquire more of Intermodal's property than reasonably necessary for the proposed use.

In her decision of December 11, 2009, the ALJ explained that the hearing had been focused on the question of "whether the railroad needed the entire property, including the air rights, or

whether [only] the land itself was needed for intermodal parking."
The ALJ noted that Norfolk had presented evidence showing that
construction of a parking garage above space used for intermodal
parking would decrease "the number of parking spaces available
and increase the dwell time" for trucks in the yard.

Intermodal also had argued that Norfolk failed to establish in
"absolute terms" the precise number of parking spaces or acres
required for the anticipated increase in its current business and
the additional traffic resulting from implementation of the Cres-
cent Corridor project. The ALJ observed that "[t]he statute does
not [speak] in terms of precise numbers" when requiring that the
railroad only take what was necessary for its use, and there were
no NJDOT regulations on the issue.

The ALJ stated that it was unrealistic to expect a railroad to
identify an exact number of parking spaces and acres required to
justify the taking of private property. The ALJ concluded that
the evidence presented by Norfolk was sufficient to satisfy the
requirement in *N.J.S.A.* 48:12–35.1 that it not take more property
than is reasonably necessary. We agree.

As the record shows, Norfolk seeks to acquire the Intermodal
property so that it can expand the capacity of Croxton Yard to
address the projected increase in its intermodal freight business.
We are satisfied that there is sufficient credible evidence in the
record to support the ALJ's finding the proposed taking does not
exceed the amount of land reasonably required for that purpose.

VI.

 We turn to Intermodal's contention that the ALJ erred by
finding that federal law preempts the provision of *N.J.S.A.* 48:12–
35.1, which requires the condemning railroad to establish that
"alternative property suitable for the specific proposed use of the
property ... is unavailable ... through on-site accommoda-
tion...."

Under the ICCTA, the STB has exclusive jurisdiction over:

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State[.]

[49 *U.S.C.A.* § 10501(b).]

Rail "transportation" is broadly defined to include yards and rail facilities. 49 *U.S.C.A.* § 10102(9).

 By its enactment of these statutes, Congress intended to preempt all laws involving economic regulation of railroads. *Vill. of Ridgefield Park v. N.Y., Susquehanna & W. Ry. Corp.*, 163 *N.J.* 446, 455, 750 *A.2d* 57 (2000). This preemption extends to local land use restrictions "because they 'can be used to frustrate transportation-related activities and interfere with interstate commerce. To the extent that they are used in this way (e.g., that restrictions are placed on where a railroad facility can be located), courts have found that the local regulations are preempted by the ICCTA.'" *Id.* at 457, 750 *A.2d* 57 (quoting *Borough of Riverdale Petition For Declaratory Order the N.Y., Susquehanna & W. Ry. Corp.*, 1999 *WL* 715272, *6, 1999 *S.T.B. LEXIS* 531, *18 (Sept. 9, 1999)).

 However, "[f]ederal preemption does not completely remove any ability of state or local authorities to take action that affects railroad property. To the contrary, state and local regulation is permissible where it does not interfere with interstate rail operations[.]" *Maumee v. W.R.R. Corp. and RMW Ventures, LLC—Petition for Declaratory Order*, 2004 *WL* 395835, *1, 2004 *S.T.B. LEXIS* 140, *1 (March 2, 2004). Although the preemption clause of 49 *U.S.C.A.* § 10501(b) "is broad and far-reaching," according to the STB, where "state or local actions . . . are not per se preempted, the . . . preemption analysis requires a factual assessment of whether that action would have the effect of preventing or unreasonably interfering with rail transportation." *Mid–America Locomotive & Car Repair, Inc.*, 2005 *WL* 1326958, *3, 2005 *S.T.B. LEXIS* 233, *8–9 (June 6, 2005).

In finding preemption in this matter, the ALJ relied upon *Dakota, Minnesota and Eastern Railroad Corp. v. South Dakota,* 236 *F.Supp.*2d 989 (D.S.D.2002), *affirmed in part and modified in part,* 362 *F.*3d 512 (8th Cir.2004). In that case, the District Court considered several statutory provisions within South Dakota's "state eminent domain laws with respect to railroads." *Id.* at 997. One of those provisions required the condemning railroad to submit documentation showing that it possessed "the financial resources necessary to complete the proposed" project, and another provision which required the railroad to file a detailed plat of the construction or reconstruction. *Id.* at 998.

The railroad presented testimony that the first provision posed "an insurmountable barrier" to its proposed project because investors would not "give the project serious consideration if the railroad's authority to use eminent domain [was] uncertain." *Id.* at 999. The railroad challenged the second provision on similar grounds, explaining that meeting the state's requirements for submission of a detailed plat for the entire project "would not be economical because many of the design plans [would] need to be altered as construction [took] place." *Id.* at 1003.

The District Court stated that the "the ICCTA has preempted all state efforts to regulate railroads." *Id.* at 1005. The court found that requiring the railroad to abide by either of the disputed provisions would essentially halt the project. *Id.* at 1006–07. The court therefore concluded "that interference to th[at] magnitude ... constitutes regulation and is expressly preempted by the ICCTA." *Id.* at 1007.

The District Court noted that the STB had concluded that the railroad's eminent domain authority was an issue of state law. *Id.* at 1009. The court pointed out that "Congress did not intend to preempt the field of eminent domain in enacting the ICCTA." *Ibid.* The court found, however, that South Dakota's eminent domain provisions had "only a tenuous connection to a delegation of eminent domain power and instead attempt[ed] to regulate railroads." *Id.* at 1009.

As we noted previously, *N.J.S.A.* 48:12–35.1 states that before a railroad may acquire private property by condemnation, the railroad must

demonstrate ... that *alternative property suitable for the specific proposed use of the property to be take is unavailable, either through on-site accommodation* or through voluntary sale of alternative, reasonably situated property, and that the interest in the property to be taken does not exceed what is necessary for the proposed use[.]

[Emphasis added.]

Although the term "on-site accommodation" is not defined in the statute, the statutory language refers back to "alternative property" and means that, before condemning private property, a railroad is required to establish that it does not have property on its site that is suitable for the specific proposed use of the property to be taken. Nothing in the statute suggests that the railroad must reorganize its facility or alter its operations in order to accommodate that use.

We are therefore convinced that, when viewed in the context of the other requirements in *N.J.S.A.* 48:12–35.1, and giving the relevant language its plain meaning, the statute should be interpreted as requiring a railroad to demonstrate that it does not possess suitable property for the specific proposed use of the property to be taken that is either not being used or slated for other operational use in the foreseeable future. Had the Legislature intended to impose a more restrictive requirement on a railroad's exercise of the condemnation power, it would have done so by using different language or by defining the term "on-site accommodation."

Therefore, unlike the provisions in the South Dakota eminent domain statute at issue in *Dakota, Minnesota and Eastern Railroad Corp.*, a statute requiring the railroad to consider alternatives "through on-site accommodation" is not sufficiently burdensome to constitute regulation of the railroad. The provision merely ensures that the railroad has considered reasonable on-site alternatives prior to exercising the State's eminent domain power.

As such, the statute does not constitute the regulation of railroad transportation and it is not preempted by the ICCTA.

Here, the ALJ erroneously found that the "on-site accommodation" provision of *N.J.S.A.* 48:12–35.1 is preempted by the ICCTA and precluded the parties from presenting any evidence on that issue. Because a railroad may not condemn property unless it shows that there is no such alternative property "through on-site accommodation" for the proposed specific use of the property to be taken, we reverse the decision authorizing Norfolk to proceed with the condemnation and remand to the OAL for further proceedings on this issue.

## VII.

▌ Intermodal additionally argues that the ALJ erred by requiring that it carry the burden of proof on the issue of whether the proposed taking would not cause it to suffer undue injury. *See N.J.S.A.* 48:3–17.7. We do not agree.

▌ Generally, burdens of persuasion and production are placed on the party "best able to satisfy those burdens." *J.E. on Behalf of G.E. v. State*, 131 *N.J.* 552, 569, 622 *A.*2d 227 (1993) (citing *Lascari v. Bd. of Educ.*, 116 *N.J.* 30, 45, 560 *A.*2d 1180 (1989); *Andersen v. Exxon Co.*, 89 *N.J.* 483, 500, 446 *A.*2d 486 (1982)). The party with "greater expertise and access to relevant information" should be required to bear these evidentiary burdens. *Id.* at 569–70, 622 *A.*2d 227 (citing *Lascari, supra,* 116 *N.J.* at 45, 560 *A.*2d 1180; *Andersen, supra,* 89 *N.J.* at 500, 446 *A.*2d 486).

In our view, a party whose property is to be taken has a better understanding of whether the taking will cause it undue injury or hardship than the condemning party. It will also have better access to information relevant to that issue. Therefore, we conclude that the ALJ properly allocated the burden of persuasion and production upon Intermodal to show that the proposed taking of its property would not cause it undue injury or hardship.

Intermodal argues that it will be unduly injured by the taking. It says that it will lose its entire fee interest in the property, its existing tenant, and the right to proceed with development of a project for off-street parking. However, Intermodal is entitled to just compensation for the taking.

Intermodal further argues that Norfolk has not shown any immediate need for the property. The ALJ found, however, that the needs of Norfolk's business reasonably demand acquisition of the property and that finding is supported by substantial credible evidence.

Accordingly, we conclude that all of the ALJ's findings of fact and conclusions of law are legally sound and supported by sufficient credible evidence with the exception of the ALJ's determination that federal law preempts the provision of *N.J.S.A.* 48:12–35.1, which requires the railroad to show that alternative property suitable for the proposed use is unavailable "through on-site accommodation." We remand the matter to the OAL for further proceedings on that issue only.

Reversed and remanded for further proceedings in conformance with this opinion. We do not retain jurisdiction.