SYLLABUS

(This syllabus is not part of the opinion of the Court.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Supreme Court.  Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

## Norfolk Southern Railway Company v. Intermodal Properties, LLC (A-117-11) (070240)

**Argued May 14, 2013 -- Decided August 6, 2013**

**HOENS, J., writing for a unanimous Court.**

In this appeal, the Court considers two statutory provisions relating to the eminent domain power vested in public utilities and railroads: (1) the limitation in N.J.S.A. 48:3-17.7 that a public utility's taking of private property be "not incompatible with the public interest"; and (2) the requirement in N.J.S.A. 48:12-35.1 that a railroad may only take property to the extent that the "exigencies of business may demand."

Plaintiff Norfolk Southern Railway Company owns and operates Croxton Yard, a large intermodal freight facility in Secaucus, New Jersey.  At Croxton, which is open nearly around the clock, freight containers are transferred between trains and tractor-trailer trucks for delivery to final destinations.  Containers are off-loaded from trucks or trains and placed in parking spaces prior to being transferred to the next transportation modality.  The yard is typically at eighty percent capacity, and over 1,500 trucks pass through it each day.  In order to remain efficient, Norfolk Southern must limit dwell time within the yard, which is a measure of the time it takes a truck to enter and leave the yard, as well as how long a container stays in the yard between off-loading and pick-up.  By 2002, existing traffic had caused double-parking of containers and increased dwell time, and business was expected to continue to grow.  The railroad's future plans included the Crescent Corridor project, which would expand rail service from ports in New York and New Jersey across the United States and into Mexico.  In 2004, Norfolk Southern decided to expand the yard by acquiring three adjacent properties, including one owned by defendant Intermodal Properties, LLC.  Intermodal's property would provide 291 additional parking spaces and would connect Croxton with Norfolk Southern's land on the other side of Intermodal's property.  The property's proximity to the tracks also would improve efficiency without increasing dwell time.  Intermodal rejected Norfolk Southern's offers, and the railroad initiated condemnation proceedings through a petition filed with the New Jersey Department of Transportation, which referred the contested case to an Administrative Law Judge (ALJ).

Intermodal proposed to use the property as a parking facility for the Secaucus Junction passenger rail station, a use it contended was more compatible with the public interest.  The ALJ precluded Intermodal from invoking the prior public use doctrine because the property was not being used for a public purpose and was not zoned to permit a parking facility.  Intermodal succeeded in having the property rezoned, but the ALJ deemed this irrelevant since Intermodal presented no evidence that any entity was willing to enter into a contract for public parking.  In contrast, the railroad's condemnation would advance the public interest in several ways, including alleviating highway congestion, reducing dwell time, and increasing railroad efficiency.  The ALJ also disagreed with Intermodal's contention that the statutory provision permitting a taking only "as exigencies of business may demand" required the railroad to demonstrate an urgent need.  Instead, the ALJ found that the language permitted condemnation when necessary to meet business demands, although more than mere convenience was required to justify the taking.  In light of the projected rapid growth of intermodal business and the planned Crescent Corridor project, the ALJ concluded that Norfolk Southern had satisfied this requirement.

Intermodal appealed, and the Appellate Division affirmed the ALJ's findings with respect to the two issues in dispute here.  Norfolk S. Ry. Co. v. Intermodal Props., LLC, 424 N.J. Super. 106 (App. Div. 2012).  The panel agreed with the ALJ's factual findings, concluding that permitting the railroad to exercise its eminent domain power was not incompatible with the public interest.  The panel also agreed that Intermodal was precluded from presenting evidence of its proposed future use and could not invoke the prior public use doctrine.  Finally, the panel adopted the ALJ's interpretation of "exigency," finding that the railroad's foreseeable future needs were reasonable business needs requiring acquisition of Intermodal's property.  The Court granted Intermodal's petition for certification.  210 N.J. 261 (2012).

**HELD:** Norfolk Southern's proposed use meets the requirement of N.J.S.A. 48:3-17.7 that the taking be "not incompatible with the public interest." Intermodal may not invoke the prior public use doctrine because it lacks the power to condemn and its proposed use is neither prior nor public. As used in N.J.S.A. 48:12-35.1, "exigencies of business" does not necessitate an urgent need for land in order to justify a taking. Rather, it limits a railroad's power to condemn to those circumstances where the general needs or ordinary course of business require it.

1. N.J.S.A. 48:3-17.7 requires that a railroad's taking by eminent domain be "not incompatible with the public interest." New Jersey courts have found that railroads and their related facilities are public uses. The question of whether a property owner can defeat a railroad's exercise of eminent domain by introducing proofs that the owner's proposed use would better serve the public interest requires analysis of the prior public use doctrine. That doctrine prohibits condemnation where a proposed use will either destroy an existing public use or prevent a proposed one. The property owner invoking the doctrine also must have the power to condemn. At the time the railroad sought to condemn Intermodal's property, Intermodal's use was not public, and its successful rezoning is irrelevant because there is no evidence the proposed future use would be anything but a private venture. Intermodal cannot invoke the prior public use doctrine because it does not have condemnation authority and its proposed use, a speculative plan for a profit-making parking facility, is neither prior nor public. Finally, N.J.S.A. 48:3-17.7 focuses on the condemnor's proposed use and does not require consideration of any alternative proposals that may be more in the public interest. Norfolk Southern's proposed use meets the statutory requirement. (pp. 24-30)

2. When interpreting statutory language, a court's primary task is to understand and give effect to the Legislature's intent, looking first to the plain language of the statute and turning to other interpretive aids in the face of ambiguity. N.J.S.A. 48:12-35.1 limits a railroad's power to condemn to circumstances "as exigencies of business may demand." Modern understandings of words or phrases may not be appropriate guides in statutory interpretation where, as here, the statute in question was crafted more than a century ago. Modern day definitions of "exigency" are inconsistent and lead to contrary conclusions, requiring consideration of related legislation and decisions published during the timeframe when the phrase was chosen by the Legislature. Review of these materials reveals that, in the past, the phrase "exigencies of business" was regarded as a term of art used to mean the general needs or ordinary course of business, rather than the modern day suggestion of an urgent or pressing need, which is derived from contemporary criminal jurisprudence. The phrase "exigencies of business" must be interpreted in accordance with the manner in which it was used when the language was chosen. This interpretation is the most sensible one in light of the way in which railroads are developed and built, requiring long-term planning. There is no basis on which to conclude that the Legislature intended to demand that railroads prove an urgent, immediate, or emergent need for land as a prerequisite to exercising their statutory condemnation authority. (pp. 30-42)

The judgment of the Appellate Division is **AFFIRMED**.

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN and PATTERSON; and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE HOENS's opinion.**

2

NORFOLK SOUTHERN RAILWAY
COMPANY, a Virginia
Corporation,

    Petitioner-Respondent,

        v.

INTERMODAL PROPERTIES, LLC,

    Respondent-Appellant.


        Argued May 14, 2013 – Decided August 6, 2013

        On certification to the Superior Court,
        Appellate Division, whose opinion is
        reported at 424 N.J. Super. 106 (2012).

        Eric D. McCullough argued the cause for
        appellant (Waters, McPherson, McNeill,
        attorneys; Mr. McCullough and James P.
        Dugan, of counsel).

        Alan P. Fox argued the cause for respondent
        (Capehart & Scatchard, attorneys; Mr. Fox
        and John K. Fiorilla, of counsel).

        Carl A. Wyhopen, Deputy Attorney General,
        submitted a letter on behalf of respondent
        Commissioner of Transportation (Jeffrey S.
        Chiesa, Attorney General of New Jersey,
        attorney).

        Nancy Winkelman submitted a brief on behalf
        of amici curiae The American Short Line &
        Regional Railroad Association, The
        Association of American Railroads,
        Consolidated Rail Corporation, CSX
        Transportation, Inc., and The New Jersey
        Short Line Railroad Association (Schnader
        Harrison Segal & Lewis, attorneys).

JUSTICE HOENS delivered the opinion of the Court.

The State's power to condemn private property is strictly limited by the constitutional rights of citizens to be free of takings without just compensation.  See U.S. Const. amend. V; N.J. Const. art. IV, § 6, ¶ 3.  Moreover, as a further means to protect the constitutional rights of the people, the Legislature enacted the Eminent Domain Act of 1971, N.J.S.A. 20:3-1 to -50, to govern the manner in which the State may exercise its authority to condemn.

In addition to the general statutory framework embodied in the Eminent Domain Act, our Legislature has enacted other statutes that govern the exercise of the power of eminent domain, including two that are at the center of the dispute now before this Court.  The first of these statutes authorizes public utilities, including railroads, to exercise the power of eminent domain and defines the circumstances and the manner in which they may do so.  See N.J.S.A. 48:3-17.6 to -17.8.  The second of these statutes applies specifically to railroads and further defines the extent of their authority to condemn.  See N.J.S.A. 48:12-35.1.

This appeal arises from the exercise of the power of eminent domain by plaintiff, Norfolk Southern Railway Company, as a means to take property owned by defendant, Intermodal Properties, LLC, for use in the expansion of the railroad's

2

facility in Secaucus.  That exercise by the railroad of its authority to condemn was challenged by defendant, leading to decisions by an Administrative Law Judge (ALJ) and by the Appellate Division interpreting the two statutes and giving rise to the two questions of statutory interpretation that are now before this Court.

First, we are called upon to determine whether the railroad's taking of the property met the statutory proscription that it be "not incompatible with the public interest[.]" N.J.S.A. 48:3-17.7.  Second, we are asked to consider whether the railroad demonstrated that the taking of defendant's property was occasioned by the "exigencies of business" within the meaning of that phrase as it is used in the statute that governs takings by railroads in particular.  N.J.S.A. 48:12-35.1.

I.

Norfolk Southern owns a large tract of land in Secaucus, comprised of between 240 and 275 acres, where it operates a freight facility known as Croxton Yard (Croxton).  Croxton is an intermodal freight facility, meaning that it accommodates transportation of goods by more than one form, or modality, of carrier, as for example, by rail and by truck.  At Croxton, freight containers are transferred between trains and tractor-

3

trailer trucks to facilitate the transport of freight to its eventual destination.

Norfolk Southern operates the Croxton facility nearly around the clock, spanning twenty-four hours each weekday and sixteen hours each day on weekends. According to a 2007 estimate, approximately 1,500 to 2,000 trucks then moved through Croxton each day, accounting each month for approximately 18,000 lifts, a term that refers to the loading and unloading of a container from a train.

Containers are off-loaded at Croxton and moved to parking spaces within the yard prior to being loaded onto the next transportation modality for distribution. Parking spaces are, on average, filled with containers and trailers to eighty percent of capacity, reaching one hundred percent full to capacity on Monday mornings. In addition, elsewhere in the facility, there is an area where empty containers are stored while waiting to be reloaded onto trains as space becomes available. In 2007, there were an average of 400 to 500 empty containers parked in that area each week, with the total sometimes reaching 1,000.

Rail carriers such as Norfolk Southern compete for customers, requiring that they maintain efficiency. One measure of efficiency that is significant to customers is dwell time. As the ALJ found, dwell time is

4

a measurement of how long it takes for a truck to enter a yard and depart the yard [and] is also used as a measurement of the amount of time that a container stays in the yard from the time it is off-loaded from the train until it is picked up by the carrier. . . . If dwell time increases significantly, it can reach a point where it is no longer profitable for customers to ship by intermodal and they can decide to move cargo to another carrier or by truck.

In 2002, Norfolk Southern concluded that its intermodal business in general was expanding rapidly and that, in order to meet the anticipated demand, it would need to expand the Croxton facility. That conclusion was based on a variety of considerations. First, the existing traffic at Croxton had already led to double-parking of containers, which made it difficult to move trucks around the yard and increased dwell time. Second, Norfolk Southern projected that freight growth in New Jersey, by some estimates, would double within ten to fifteen years and, according to other projections, would continue to grow for twenty-five years. Third, the railroad projected that the overall traffic using Croxton would increase based in part on forecasts prompted by a new undertaking known as the Crescent Corridor Project. That project was a long-range plan by the railroad to expand rail service from ports in New Jersey and New York into the southeastern and western regions of the United States and thereafter into Mexico.

5

Norfolk Southern concluded that the solution to all of its growth concerns was to increase its facilities at Croxton. Moreover, the railroad determined that it would need to acquire nearby or adjacent properties in order to accommodate the expansion at Croxton. As a result, in May 2004, the railroad's managers decided to sell a piece of property across from Croxton that was owned by the railroad and to use the proceeds to acquire three properties they believed were needed for the expansion of their facility. One of those properties is owned by Intermodal.

Intermodal's property, comprising approximately 5.99 acres, is adjacent to Croxton. It is currently the site of an 80,000 square foot warehouse which, at all times relevant to this dispute, was leased by Intermodal to a company that operated a freight-forwarding business. Acquisition of Intermodal's property would allow the railroad to create an additional 291 container parking spaces and would connect Croxton with another small parcel of land on the other side of Intermodal's property that is owned by Norfolk Southern. In addition, because Intermodal's property is close to Croxton's tracks, it would not increase dwell time and would improve the efficiency of the operations at Croxton.

At the time when Norfolk Southern embarked on its effort to acquire the property, the railroad projected it would need the

6

Intermodal property within five years. Norfolk Southern entered into negotiations to acquire the Intermodal property, but its offers were rebuffed. By September 2005, Intermodal had informed the railroad that it was not interested in selling the property. As a result, Norfolk Southern initiated condemnation proceedings through a petition filed with the New Jersey Department of Transportation (NJDOT) as a means to acquire the Intermodal property.

A.

The matter was deemed to be a contested case, referred by NJDOT to the Office of Administrative Law (OAL) and assigned to an ALJ. Before commencing the hearing on the railroad's petition, the ALJ considered, and decided, the two issues that were raised by Intermodal and are now before this Court. The ALJ's determination of those issues, to a large extent, shaped the testimony and evidence that the parties offered.[1]

---

[1] The ALJ also addressed an issue arising from the amendment, effective January 13, 2008, of one of the statutes governing this dispute. That is, N.J.S.A. 48:12-35.1 was amended to include a requirement that a railroad seeking to condemn property establish that "alternative property suitable for the specific proposed use of the property to be taken is unavailable . . . and that the interest in the property to be taken does not exceed what is necessary for the proposed use[.]" L. 2007, c. 290, § 1. The ALJ agreed with Norfolk Southern that the amendments were preempted by federal law and therefore precluded Intermodal from presenting any evidence on the issue. The Appellate Division reversed, determining that the amendments were not preempted by federal law, and remanded the matter to the OAL for further proceedings. Norfolk S. Ry. Co. v.

Intermodal's first argument focused on the statutory command that the taking be "not incompatible with the public interest[.]"  N.J.S.A. 48:3-17.7.  In particular, Intermodal sought to offer evidence that it proposed to use its property as a parking facility that would serve the nearby Secaucus Junction passenger rail station.  It argued that its proposed use would be more compatible with the public interest than the use proposed by Norfolk Southern and that the railroad therefore should be prohibited from exercising the power to condemn.

The ALJ rejected Intermodal's proffer for two reasons.  First, observing that Intermodal's property was not zoned for use as a parking facility, the ALJ concluded that Intermodal could not demonstrate that its property could be used for the purpose it proposed.  Second, the ALJ ruled that, pursuant to the prior public use doctrine, evidence of the type Intermodal sought to present would only be relevant if the property were already being used to serve a public purpose.  Because Intermodal could not meet that test, the ALJ barred it from offering any evidence relating to the property's potential use as a parking facility.

---

Intermodal Props., LLC, 424 N.J. Super. 106, 115, 124-128 (App. Div. 2012).  Because the railroad did not file a cross-petition challenging this aspect of the Appellate Division's decision, the issue is not before us.

8

Intermodal's second argument was based on the statutory authorization that only permitted a taking "as exigencies of business may demand[.]" N.J.S.A. 48:12-35.1. Specifically, Intermodal asserted that the statutory language required the railroad to demonstrate that there was an emergency before it could exercise the power to condemn. The ALJ rejected that interpretation, concluding that the statute did not limit a taking to emergencies, and reasoning that the phrase was used instead to permit the railroad to condemn property as the needs of its business reasonably demanded.

After making those preliminary legal determinations, the ALJ conducted numerous hearings, starting in November 2007, but held on non-sequential days. During the delays between the hearings, Intermodal successfully petitioned the New Jersey Meadowlands Commission (Meadowlands Commission) to have its property rezoned from the Intermodal B zone to the Transportation Center zone. The effect of that zoning change was that Intermodal's proposed commuter parking facility for the Secaucus Junction station would be a permitted use.[2]

Following the completion of the hearings and consideration of the testimony and evidence presented by the parties, the ALJ issued a comprehensive written decision on December 11, 2009.

[2] Norfolk Southern appealed the decision of the Meadowlands Commission changing the zone, but the decision was affirmed by the Appellate Division in an unpublished opinion.

As it relates to the issues on appeal, that decision separately analyzed whether the taking of the land by the railroad was "not incompatible with the public interest" and whether the railroad was taking Intermodal's property because of the "exigencies of business[.]"  In summary, the ALJ answered both questions in favor of Norfolk Southern.

First, in determining whether the taking was "not incompatible with the public interest," the ALJ relied heavily on the testimony of Susan Gruel, a licensed planner who testified on the railroad's behalf.  Gruel testified that the location of Intermodal's property, which is near the freight facility and has direct access to the New Jersey Turnpike, made it particularly suitable to promote intermodal access.  She opined that the taking for the expansion of Croxton is compatible with the objectives of the Meadowlands Master Plan, the Hudson County Master Plan, and other regional economic growth plans.

Gruel also testified that the taking would further the goals of other local, regional, and state-wide plans, including the Hudson County Strategic Revitalization Plan, which sought to upgrade intermodal systems and to find alternatives to truck traffic; the New Jersey State Development and Redevelopment Plan, which was designed to promote economic development, develop transportation alternatives, and protect the

10

environment; and the Regional Transportation Plan-Access and Mobility 2003 for North Jersey, which also noted the need to increase rail facilities and reduce reliance on trucks.

In addition, Gruel testified that the condemnation would advance the goals set by the NJDOT. Specifically, she found support in two NJDOT documents. First, she noted that a study referred to as Portway, which was intended to coordinate infrastructure projects to improve transportation access between Newark and Elizabeth, projected a significant increase in the need to move goods and identified a corollary need to enhance rail facilities as a means to minimize environmental impacts. Second, she observed that in the Update Report of the New Jersey State Rail Planning Process, NJDOT recommended the development of rail services as a way to save energy and reduce highway congestion.

During the hearings before the ALJ, Intermodal attempted to question Gruel about whether the rezoning of its property demonstrated that the Meadowlands Commission viewed a parking facility as a better planning option for the property than the one proposed by the railroad. The ALJ precluded that line of questioning because Intermodal had not presented any evidence that the State or any other public entity was willing to enter into a contract with Intermodal to provide public parking for Secaucus Junction. Therefore, the ALJ deemed Intermodal's line

11

of questioning to be irrelevant because Intermodal could not claim the protection of the prior public use doctrine.

Ultimately, in deciding whether Norfolk Southern had demonstrated that the taking was "not incompatible with the public interest[,]" N.J.S.A. 48:3-17.7, the ALJ concluded that the condemnation of Intermodal's property would advance the public interest in several ways. The ALJ found support in the plans and the studies cited by Gruel as well as in the other evidence that the railroad had presented. In particular, she found that the taking would further the realization of the Crescent Corridor project which, in turn, would advance the public interest by alleviating congestion on the highways. Moreover, the ALJ recognized that the taking would further the goal of reducing dwell time. In this regard, she found that dwell time was a significant consideration, observing that in January 2007, Norfolk Southern had upgraded the system for trucks entering its yard from the access road, installing an automated gate and adding lanes, in an effort to reduce dwell time. Finally, the ALJ credited testimony that the expansion also would increase railroad efficiency and decrease pollution by lessening the time trucks were on the road. In short, the ALJ concluded that the condemnation was "clearly in the public interest."

12

Second, the ALJ considered the arguments concerning whether the condemnation was justified by the exigencies of the railroad's business. See N.J.S.A. 48:12-35.1. In analyzing whether the railroad had met that statutory test, the ALJ reiterated her pre-hearing order setting forth her understanding, in accordance with a dictionary definition, that the term "exigency" did not mean emergency but, instead, meant "the need, demand or requirement intrinsic to a circumstance or condition." Even so, the ALJ commented that "something more is required beside mere convenience for the railroad" in order to justify Norfolk Southern's taking of the Intermodal property.

The ALJ then determined that, based on the proofs presented during the hearings, Norfolk Southern had satisfied this interpretation of the statutory requirement. She first relied on studies and testimony that projected rapid growth in intermodal business over the next ten to thirty years. She included in her analysis governmental and independent studies that advocated for growth in intermodal traffic as a way to alleviate roadway congestion and address environmental concerns.

As part of the consideration of these studies, the ALJ recognized that the recent general economic downturn had reduced intermodal traffic and that future levels of intermodal traffic could not be precisely predicted. Nonetheless, the ALJ rejected two opinions offered by Intermodal's expert directed to whether

13

the railroad had met the statutory requirement that the taking be undertaken because of the exigencies of business. Those opinions were that the traffic expansion projected by the independent studies was flawed and that if intermodal traffic were to increase, that additional traffic would not be directed to Croxton.

The ALJ rejected both opinions, explaining that Intermodal's expert had offered no supporting evidence to substantiate either of those views. On the contrary, the ALJ observed that, in transportation planning, it is not unusual to project fifteen to thirty years into the future. In evaluating Norfolk Southern's projections, the ALJ found that the evidence supported the railroad's contention that intermodal traffic would expand to the point where the land it sought to acquire would be needed at Croxton within the next ten years.

In addition, the ALJ found that the Crescent Corridor project would add to those growth projections, thus requiring an expansion of Croxton to facilitate the demands created by that project. As part of her consideration of that evidence, the ALJ described the enormous geographic and financial scope of the Crescent Corridor project. Moreover, she considered, and rejected, two challenges that Intermodal raised to the evidence concerning the Crescent Corridor.

First, the ALJ recognized that Intermodal contended that there was no assurance that the project would actually be built as envisioned. After acknowledging that the ultimate success of the Crescent Corridor project is an open question, however, the ALJ found that Norfolk Southern was committed to the project and that its goals were sound.

Similarly, the ALJ considered Intermodal's assertion that, if built, the Crescent Corridor project should not reach Croxton, but instead should terminate in Middlesex County where there is an abundance of available warehouse space. The ALJ rejected that argument because Intermodal had not investigated whether the railroad's customers would prefer that their freight be off-loaded in Middlesex County or whether that plan might cause an increase in truck traffic in New Jersey. Balancing all of these considerations, the ALJ concluded that Norfolk Southern would require the Intermodal property for the success of the Crescent Corridor project and that the railroad should not be expected to wait until that "project is up and running to begin condemnation proceedings."

In deciding whether the railroad had demonstrated that the taking was justified by the exigencies of its business, the ALJ found that Norfolk Southern had presented sufficient evidence that intermodal traffic will increase and that the Crescent

15

Corridor project, in particular, presented "sound economic and environmental reasons" to move forward with the condemnation.

In summary, therefore, the ALJ concluded that Norfolk Southern had demonstrated by a preponderance of the evidence that its taking of Intermodal's property satisfied both the statutory command that it be "not incompatible with the public interest[,]" N.J.S.A. 48:3-17.7, and that it be demanded by the exigencies of the railroad's business, see N.J.S.A. 48:12-35.1.

B.

Because the NJDOT Commissioner did not modify or reject the ALJ's decision, it became a final decision by operation of law. See N.J.S.A. 52:14B-10(c). Intermodal then filed an appeal with the Appellate Division. R. 2:2-3(a)(2). In a published opinion, the Appellate Division affirmed the ALJ's findings of fact and conclusions of law respecting the two issues in dispute before us, Norfolk S. Ry. Co. v. Intermodal Props., LLC, 424 N.J. Super. 106, 129 (App. Div. 2012), and remanded the matter for proceedings not germane to our analysis, id. at 124-28.

First, in determining that the ALJ correctly concluded that the taking was not incompatible with the public interest, the Appellate Division pointed to much of the evidence that the ALJ had found persuasive. In particular, the appellate panel looked to the evidence supporting expansion of rail and intermodal facilities found in the Meadowlands Master Plan and the Hudson

16

County Master Plan, as well as the projections for continued growth found in the New Jersey Turnpike Authority's Regional Transportation Plan and NJDOT's Portway study.  Id. at 116-17.

The appellate court also noted, quoting the ALJ, that expanding Croxton would be beneficial because it would reduce dwell time, thus "'lessen[ing] the amount of pollutants that [trucks] emit into the air.'"  Id. at 117.  The court found further support in the ALJ's findings that the Crescent Corridor project, which is consistent with the Meadowlands Master Plan, would require expansion of Croxton, again helping to alleviate "'traffic congestion and air emissions.'"  Id. at 117-18.  Taking those facts together with the "well established understanding that railroads serve a public purpose[,]" the Appellate Division concluded that permitting the railroad to exercise the power of eminent domain was not incompatible with the public interest.  Id. at 118.

As part of its analysis, the appellate panel concurred with the ALJ's refusal to permit Intermodal "to present evidence showing that the use of [its] property as a commuter parking lot would be of greater benefit to the public than the use of the property for intermodal freight operations."  Ibid.  Both because, at the time the railroad sought to take the property, it was not zoned for use as a parking facility, and because the subsequent rezoning of the property provided "no evidence

17

indicating that any State or local entity was willing to enter into an agreement with Intermodal to develop the property as a commuter parking lot[,]" id. at 118-19, the Appellate Division agreed that Intermodal could not invoke the prior public use doctrine. Not only was the property not being used for a public purpose at the time Norfolk Southern filed its condemnation petition, but, as the appellate court commented, even after the zoning change, the "development of the property as a commuter parking lot was speculative, at best." Id. at 119.

Second, the Appellate Division addressed the statutory provision that permits railroads to condemn property as the "exigencies of business may demand." Id. at 120. Rejecting Intermodal's contention that the language of the statute requires an urgent or emergency situation, the court instead agreed with the ALJ's interpretation of "exigency." Ibid. In doing so, the appellate court adopted the dictionary definition used by the ALJ, through which the phrase is understood to mean "'the need, demand, or requirement intrinsic to a circumstance, [or] condition' such as 'the exigencies of city life[.]'" Ibid. (quoting Random House Webster's Unabridged Dictionary (2d ed. 2006)).

Applying standard tools of statutory construction, the panel explained that it was "convinced that the Legislature did not intend to limit the exercise of the condemnation power in

18

N.J.S.A. 48:12-35.1 to emergency situations, [but that] a railroad may take private property by the exercise of the power of eminent domain as the needs of its business may reasonably demand." Id. at 120-21. That conclusion was based in large measure on the appellate court's recognition that the time involved in effectuating the condemnation process and in complying with the other requirements embodied in the statute is lengthy, implying that demonstrating an emergency need was not part of the Legislature's intent. Id. at 121. Rather, the railroad's decision to condemn property is "more often than not the result of long-term planning[,]" which, the panel reasoned, indicates the Legislature did not intend to limit takings to emergency situations. Ibid.

In addition to agreeing with the ALJ's analysis of the statutory language, the appellate court found sufficient credible evidence in the record to support the ALJ's finding that the railroad's foreseeable future needs, based on its growth and expansion plans, were "reasonable needs of . . . business demand[ing] the acquisition of Intermodal's property." Id. at 122.

Intermodal filed a petition for certification, which we granted. 210 N.J. 261. We thereafter granted leave to the American Short Line & Regional Railroad Association, the Association of American Railroads, Consolidated Rail Corp., CSX

19

Transportation, Inc., and the New Jersey Short Line Railroad Association to participate in the appeal as amici curiae.[3]

## II.

The parties essentially reiterate the arguments that they raised before the ALJ and the Appellate Division.

Intermodal asserts that the ALJ erred in precluding it from offering evidence that its plan to build a parking facility for the nearby commuter rail station was more compatible with the public interest than the use to which the railroad planned to put its property. As part of that argument, Intermodal contends that both the ALJ and the Appellate Division erred in their analysis of the prior public use doctrine. That erroneous analysis, Intermodal asserts, amounted to an interpretation of the governing statute that effectively authorizes the railroad to take private property regardless of whether the owner's alternative purpose might create a greater potential benefit to the public. Pointing to its successful effort to have the Meadowlands Commission rezone its property for use as a parking

---

[3] The NJDOT Commissioner filed a letter with this Court expressing opposition to Intermodal's petition for certification. Following our grant of that petition, the NJDOT Commissioner filed a statement in lieu of brief. See R. 2:6-4(c). In that statement, the Commissioner expressed the view that NJDOT was not required to participate, that the parties had adequately briefed the issues, and that NJDOT had no vested interest in the outcome. Notwithstanding that position, the Commissioner offered the opinion that the decision of the ALJ should be affirmed, as it was neither arbitrary nor capricious.

20

facility, Intermodal asserts that it was deprived of due process when the ALJ prevented it from cross-examining the railroad's planner on its proposed competing use.

Intermodal also takes issue with the interpretation of the statute relating to the exigencies of the railroad's business. It argues that the statute contemplates a present and identifiable need for the property and that the reading of the statute adopted by the ALJ and affirmed by the Appellate Division is too deferential to the railroad to be consistent with the Legislature's intent. Recognizing that long-term planning is needed for railroad development, Intermodal asks this Court to interpret the statutory language to require railroads to "show a cognizable and definite need or requirement for the taking." In short, Intermodal urges us to conclude that the Legislature chose the word "exigency" with the purpose of implying a sort of immediacy or urgency, as would be consistent with the ordinary meaning of that term, leading to the conclusion that the railroad's general concern for its long-term needs falls short of what the statute demands.

Norfolk Southern urges this Court to affirm the judgment of the Appellate Division in all respects. First, it asserts that Intermodal's effort to offer the potential use of the rezoned property is based on a misreading of the precedents permitting evaluation of another public use. As the railroad understands

21

the law, only when property was being put to a public purpose at the time of the taking does the alternative use of the property become relevant to the attempt to condemn.  Because Intermodal's property was not being put to a public purpose at the time when the railroad sought to take it, and because any future public purpose would be speculative, Norfolk Southern argues that the ALJ correctly precluded Intermodal from offering evidence relating to the plan to turn the property into a parking facility for the commuter train station.

Second, the railroad asserts that the ALJ and the Appellate Division correctly understood and applied the statutory phrase "exigencies of business."  Arguing that the Legislature must have recognized the need for long-term planning relating to railroad expansion, Norfolk Southern contends that "exigency" cannot mean "emergency," but instead must be related to projections of future growth and needs.

Amici Curiae, a group of freight railroad companies operating in New Jersey and related trade organizations, offer this Court historical background about railroads and the condemnation power granted to them.  They urge us to consider the vital importance of railroads, particularly as a means to relieve congestion on our highways, reduce engine emissions, conserve energy, and improve safety of the traveling public.  They explain that the process involved in expanding railroads is

22

lengthy and complex, and they assert that the interpretation of the statutory phrase "exigencies of business" must be consistent with these practical realities. In summary, amici urge this Court to affirm the judgment of the Appellate Division in its entirety.

III.

This appeal calls upon us to consider two statutory provisions that relate to the power that the Legislature has vested in public utilities and, more particularly, in railroads, to acquire property through exercising the power of eminent domain. First, we address the limitation placed on the exercise of the power to condemn by any public utility through the requirement that the taking be "not incompatible with the public interest." N.J.S.A. 48:17-7. Second, we consider the limitation imposed by the requirement that, when the condemnation power is exercised by a railroad, it only be permitted to take property to the extent that the "exigencies of business may demand[.]" N.J.S.A. 48:12-35.1.

A.

We need not recite the rich body of principles based upon our constitution and statutory law that inform every consideration of the exercise of the power of eminent domain, much of which is familiar and well-established. Instead, we focus only on the two specific statutory phrases before the

23

Court.  As a result, the debate before us is indeed a narrow one because the parties do not disagree that the railroad's taking is for a proposed public use.  Instead, they argue only about the evidence relevant to the requirement that the taking be not incompatible with the public interest and the meaning of the phrase "exigencies of business."

Turning first to the question about the evaluation of whether the proposed use is not incompatible with the public interest, the focus of the parties is solely on whether Intermodal should have been permitted to offer evidence concerning its different proposal for the use of its property.

We have addressed previously how to evaluate whether a proposed use is a public use.  See Twp. of W. Orange v. 769 Assocs., LLC, 172 N.J. 564, 573 (2002).  That is, we have concluded that, "'public use' is synonymous with 'public benefit,' 'public advantage,' or 'public utility.'"  Ibid. (quoting State Highway Comm'r v. Totowa Lumber & Supply Co., 96 N.J. Super. 115, 119 (App. Div. 1967)).  In particular, we described a public use in terms of one "that tends to enlarge resources, increase the industrial energies, and . . . manifestly contributes to the general welfare and the prosperity of the whole community."  Ibid.  (internal quotation marks omitted).

24

Moreover, we have recognized that railroads and related terminal facilities meet the requirements for being a public use.  See Twp. of Weehawkin v. Erie R.R. Co., 20 N.J. 572, 581-82 (1956).  That is, railroads are "bound to accommodate all freight and passenger traffic which seek its service[,]" and "[r]eceiving and terminal facilities are necessary adjuncts to the service rendered."  Id. at 581.  "The transportation of freight constitutes a public franchise, . . . and [a] proposed [terminal] facility is a necessary implement[.]"  Id. at 581 (internal citation omitted).  "The public use thus manifested is not diluted because the facility may only be enjoyed by a portion of the public."  Id. at 582.  Railroads are "bound to extend the[ir] service to all who have reasonable need for the proposed facility depending upon its capacity for transshipment of freight."  Ibid.  Therefore, railroads "should not be so strictly construed as to disallow growth and progress to meet the competitive forces of the time."  Ibid.

The question before us is whether a property owner can defeat a railroad's exercise of eminent domain by introducing proofs that the owner's proposed use of its property would better serve the public interest than would the railroad's proposed use thereof.  That assertion requires us to consider the subsidiary question raised by the parties concerning the

25

evaluation by the ALJ and the Appellate Division of the prior public use doctrine.

The prior public use doctrine has a specific meaning and application. It arose in the context of disputes over land between two entities, each of which had condemnation power. Id. at 579. The circumstances we encountered in Weehawken aptly illustrate the concern that gave rise to the doctrine. There, a railroad owned two parcels and the municipality desired to condemn one for use as a baseball field and other recreational purposes. Id. at 578. In that context, this Court recognized that each litigant had the authority to condemn and each asserted that it intended to use the property for a public purpose. We also recognized that in that unique circumstance, in the absence of either a rule of law or special legislation designed to end the dispute, the two entities could engage in an endless round of condemnation and re-condemnation, with each seeking to acquire the property by asserting its power of eminent domain. Id. at 579.

In order to create certainty, this Court crafted the prior public use doctrine, which operates to "den[y] exercise of the power of condemnation where the proposed use will destroy an existing public use or prevent a proposed public use unless the authority to do so has been expressly given by the Legislature or must necessarily be implied." Ibid. The application of the

26

doctrine, therefore, is both specific and narrow. It does not automatically apply merely because property is already being used for a public purpose. See Texas E. Transmission Corp. v. Wildlife Preserves, Inc., 48 N.J. 261, 268-69 (1966) (denying "public-spirited" conservation group protection of prior public use doctrine for private land voluntarily devoted to use as wildlife preserve because conservation group lacked condemnation authority).

That is, a property owner that devotes its property to a worthy public purpose, unless it also has the power to condemn, cannot avail itself of the protections of the prior public use doctrine. Id. at 267-68. Moreover, as we explained, if the prior public use doctrine does not apply, "no comparative evaluation of two public uses, one existing and one proposed, need be undertaken in order to determine which should prevail as the paramount use." Id. at 273. Therefore, an owner cannot look to the prior public use doctrine to defend against a condemnation action absent a pre-existing, public use coupled with the power of eminent domain, nor may it suggest that there is a potential or future proposed use that might be more beneficial than the proposed use put forth by the condemnor.

With these precedents to guide us, our evaluation of Intermodal's argument is clear. First, Intermodal's use of the property at the time that the railroad sought to exercise the

27

power of eminent domain was not a public use. The record reflects that, at the time, the Intermodal property was being used by private entities for truck parking. Moreover, at the time, the property could not have been devoted to the public use that Intermodal has identified because it would have been inconsistent with the zoning ordinance. Nor is it relevant that Intermodal succeeded in rezoning the property as part of its effort to potentially achieve its stated public purpose of creating a parking facility for the nearby commuter train station. Although achieving that purpose might have served the public interest in some sense, Intermodal has not suggested that it would be anything but a privately owned and profit-driven venture. Intermodal cannot claim the protection of the prior public use doctrine because the use to which it points is neither a prior use nor a public one, but is instead a speculative, future plan for a profit-making venture.

More fundamentally, the prior public use doctrine would only apply if the property owner itself had the power of eminent domain, as if, for example, the municipality had already taken Intermodal's property for a parking facility. Because Intermodal lacks the power to condemn, the prior public use doctrine can have no application to this dispute over the railroad's exercise of its power of eminent domain.

Finally, the language of the statute speaks only to the requirement that the taking be "not incompatible with the public interest." N.J.S.A. 48:3-17.7. That statutory language demands that the focus be on the proposed use identified by the condemnor; as we have held, in the absence of a previously existing public use, it does not permit a comparative analysis of a competing public purpose that an owner proposes. See Texas E. Transmission Corp., supra, 48 N.J. at 273. That is, the statute requires evaluation of whether the purpose proposed by the condemning authority is incompatible with the public interest, not whether there is some alternative proposal that might be more in the public interest.

In the end, Intermodal's interpretation of the statute asked the ALJ to engage in the latter analysis, seeking permission to offer a plan that Intermodal thought would be a better or more worthy purpose. Whether, in fact, the plan proposed by Intermodal would have been a better one than that which the railroad proposed, however, is of no moment in light of the clear language that the Legislature chose when creating the boundaries within which the railroad may exercise the power of eminent domain. We, therefore, detect no error in the analysis of the ALJ or in the judgment of the Appellate Division concluding that the railroad's proposed use of the property was

29

"not incompatible with the public interest" as defined by the statute.

B.

The second argument raised by the parties rests as well on a debate about statutory interpretation. Because in this aspect of the appeal we are called upon to interpret the meaning of a word or phrase chosen by the Legislature, we recite briefly the familiar concepts of statutory construction that guide us.

Courts ordinarily "'give substantial deference to the interpretation an agency gives to a statute that the agency is charged with enforcing.'" R & R Mktg., LLC v. Brown-Forman Corp., 158 N.J. 170, 175 (1999) (quoting Smith v. Dir., Div. of Taxation, 108 N.J. 19, 25 (1987)); accord Richardson v. Bd. of Trs., Police & Firemens' Ret. Sys., 192 N.J. 189, 196 (2007). However, we are "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." In re Taylor, 158 N.J. 644, 658 (1999) (quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973)).

As we have long recognized, in general, "[i]n any matter requiring our consideration of a statute, our essential task is to understand and give effect to the intent of the Legislature." Pizzullo v. N.J. Mfrs. Ins. Co., 196 N.J. 251, 264 (2008); see also Roberts v. State, Div. of State Police, 191 N.J. 516, 521 (2007) (construing meaning of police disciplinary statute

30

through use of extrinsic aids); Bunk v. Port Auth. of N.Y. & N.J., 144 N.J. 176, 194 (1996) (construing intent of Legislature's amendment to Worker's Compensation Act).

In engaging in that important task, "we look first to the plain language of the statute, seeking further guidance only to the extent that the Legislature's intent cannot be derived from the words that it has chosen." Pizzullo, supra, 196 N.J. at 264; accord Roberts, supra, 191 N.J. at 521. If "the language is not clear and unambiguous on its face, we look to other interpretive aids to assist us in our understanding of the Legislature's will." Pizzullo, supra, 196 N.J. at 264; see, e.g., Roberts, supra, 191 N.J. at 521 (reviewing extrinsic aids including Governor's conditional veto message and bill sponsor's statements); Panzino v. Cont'l Can Co., 71 N.J. 298, 301-03 (1976) (relying on bill sponsor's statement for guidance).

With these precedents as our guide, we turn to the dispute between the parties concerning the meaning of the statute limiting the railroad's power to condemn to circumstances "as exigencies of business may demand[.]" N.J.S.A. 48:12-35.1.

In striving to determine what the Legislature intended when it chose the word "exigencies[,]" the ALJ applied a dictionary definition. Using that approach, the ALJ concluded that the term meant "need, demand or requirement to a circumstance or condition." In affirming that conclusion, the Appellate

31

Division expanded on the analysis, considering the dictionary definition and the statute as a whole.  As the panel therefore explained, the word "exigency" did not connote an emergency or an urgent need, but instead, when viewed in light of the entire statute, was meant to convey the reasonable demands of the business of a railroad.  Norfolk Southern, supra, 424 N.J. Super. at 120-21 (citing Hubner v. Spring Valley Equestrian Ctr., 203 N.J. 184, 195 (2010)).

Our evaluation proceeds on a somewhat different course because modern day definitions are inconsistent and lead to contrary conclusions.  Although the ALJ and the appellate court used a dictionary that gave a definition that apparently fits the overall statutory intent, it is not the only dictionary definition for the term we are called upon to interpret.  Other dictionaries define exigency in terms of "a state of affairs that makes urgent demands[,]" Webster's Ninth New Collegiate Dictionary 435 (1985), or as a "state of urgency; a situation requiring immediate action[,]" Black's Law Dictionary 655 (9th ed. 2009).

Those definitions are perhaps a reflection of the use of the term as it is meant in the context of rights protected by the Fourth Amendment, see U.S. Const. amend. IV, and by our parallel constitutional provision, see N.J. Const. art. I, ¶ 7. In that context, the word, which is ordinarily used in the

32

phrase "exigent circumstances," always connotes a sense of urgency or emergency in which action is needed. See State v. Johnson, 193 N.J. 528, 552-53 (2008) (observing that term "cannot be precisely defined . . . [but involves circumstances] when inaction due to the time needed to obtain a warrant will create a substantial likelihood that the police or members of the public will be exposed to physical danger or that evidence will be destroyed or removed from the scene"); see also Black's Law Dictionary 277 (9th ed. 2009) (defining exigent circumstances as "situation that demands unusual or immediate action and that may allow people to circumvent usual procedures"). Although that understanding of the term, having found its way into common parlance, undoubtedly gave some support for Intermodal's assertion in this dispute, it is not a useful avenue for interpretation of this statute.

Rather, as this appeal illustrates, modern understandings of words or phrases may not be appropriate guides in statutory interpretation, particularly if a statute was crafted decades in the past, or, as in this case, more than a century ago. Nor are they appropriate if a statute uses a term of art, in which circumstance we are bound to construe the term "in accordance with those meanings." In re Lead Paint Litig., 191 N.J. 405, 430 (2007); see also N.J.S.A. 1:1-1 (declaring that "words . . . having a special or accepted meaning in the law, shall be

33

construed in accordance with such . . . meaning"); accord

Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 553 (2009).

In our quest to understand the meaning of the phrase used in this statute, therefore, it is appropriate for us to look to the language of the statute as well as to decisions published during the timeframe when the phrase was chosen by the Legislature in order to assist us in interpreting the phrase in accordance with its intended meaning. In particular, because the phrase connects the word "exigencies" with the word "business," it is appropriate to look to published decisions that use both of those words so that we may understand the meaning in context and, therefore, glean what the Legislature understood the phrase to mean when choosing it.

First, the phrase "exigencies of business[,]" which is now found in N.J.S.A. 48:12-35.1, is not one of recent vintage, but has deep roots in predecessor statutes governing the formation of railroads and the creation of their routes. Beginning with the 1873 Act to Authorize the Formation of Railroad Corporations and Regulate Same (1873 Act), L. 1873, c. 413, §§ 1 to 39, the Legislature created a system to govern the way in which railroads could be formed and the manner in which they were to be operated. That original enactment, which preceded the passage of the Eminent Domain Act, L. 1900, c. 53, § 1, not only granted to directors of railroads the power to take land, see L.

34

1873, c. 413, § 1, but also included sections devoted to the technicalities of the way in which the power of condemnation could be exercised and how just compensation would be established, see id. §§ 11-13.

The 1873 Act permitted takings of land for the purpose of laying tracks, creating a right of way, siting and building depots, and the like. In describing the scope of authority to take land, the Legislature used various kinds of limiting language. That is, takings for the right of way were limited to 100 feet in width, id. § 11; takings of additional land to redirect a road or turnpike so as to ease ascent and descent of the tracks was permitted "as may be deemed requisite by the directors[,]" id. § 21; and, in general, appurtenant buildings were only permitted as deemed "expedient" for the safety of property and "for necessary uses appertaining to [the railroad's] business[,]" id. § 17.

The phrase "exigencies of business[,]" as it relates to railroads, first appeared in a separate piece of legislation enacted in 1877. See An Act Concerning Railroad Corporations (1877 Act), L. 1877, c. 31, § 1. The 1877 Act, while not amending the more general railroad statute of 1873, permitted railroads to exercise the power of eminent domain "to all such lands adjoining their road as constructed on their right of way as located, as, in the judgment of the directors of such

company, the exigencies of business may demand for the erection of freight and passenger depots and all other legitimate purposes of said company[.]"  Ibid.

Apparently proceeding in parallel fashion, the more general 1873 Act was amended several times, in ways that are not germane to our analysis.  In 1887, however, the Legislature amended the 1873 Act to incorporate the language that had been used in the 1877 Act to describe the exercise of the power of eminent domain.  L. 1877, c. 31, § 1.  As a result, the 1887 amendment imported the phrase "the exigencies of business" into the more general railroad statute's pre-existing authorization of eminent domain.  After the passage of the Eminent Domain Act in 1900, L. 1900, c. 53, §§ 1 to 19, the statutes governing railroads underwent a general revision.  See 1903 Act Concerning Railroads (1903 Act), L. 1903, c. 257, §§ 1 to 89.  In part, that new statute omitted the earlier-included sections on the technical manner in which the power of eminent domain could be exercised, in favor of incorporating the procedures found in the Eminent Domain Act by reference.  See id. § 13.  The 1903 Act, therefore, included the general grant to railroads of the power of eminent domain, along with the reference to the scope of that authority being limited "as in the judgment of the [railroad's] directors . . . the exigencies of business may demand."  Ibid.

36

The 1903 Act was often referred to at the time as the General Railroad law. Section 13 of the 1903 Act, relating to the condemnation power, was amended several times thereafter, before being repealed in 1962, see L. 1962, c. 198, § 198, and replaced with the current statute, L. 1962, c. 198, § 60 (codified at N.J.S.A. 48:12-35.1). It was in 1962, in the context of classifying railroads as public utilities, see L. 1962, c. 198, § 48, that the Legislature deleted the earlier statutory reference to the "judgment of the directors," leaving only the long-standing phrase, "exigencies of business may demand" as the standard.

Throughout all of those statutory changes, since 1877, the phrase regarding the exercise of the power of eminent domain by the railroad that refers to "the exigencies of business" has not been altered. The phrase, therefore, is best understood by seeking guidance as to the meaning that was ascribed to it both in decisions construing the 1903 Act, and in decisions that utilized it in analogous contexts in the late 1800's when the Legislature included it in the laws governing railroads.

There are published decisions issued by a variety of courts that touch on the 1903 Act and that include references to the phrase "exigencies of business." For example, the 1903 Act, referred to by the court as the General Railroad Act, was the focus of a dispute in chancery about the authority of railroads

37

to condemn.  The Vice Chancellor referred to the phrase "exigencies of business" when quoting language from the statute, but decided the matter without construing the meaning of those words.  See Benton & Holden, Inc. v. Cent. R.R. Co. of N.J., 122 N.J. Eq. 309, 313 (Ch. 1937) (discussing General Railroad Act, 3 Comp. Stat., p. 4224, § 13), aff'd o.b., 123 N.J. Eq. 163 (E. & A. 1938).  Instead, the Chancellor considered whether the railroad's action, challenged as a taking, was permitted because it was done pursuant to a direction from the Board of Public Utilities (BPU).  Ibid.  Because the Legislature had amended the statute, after the railroad acted, specifically to create the authorization for a taking pursuant to a BPU directive, the Chancellor concluded that the railroad's power to condemn based on such an order did not exist previously.  Ibid.

Although the Chancellor therefore did not construe the phrase concerning exigencies, there are other published decisions that concern either the 1903 Act in general or railroads in particular that are of assistance to this Court. For example, in considering the claim of a plaintiff injured in a fall from a train platform, the Court of Errors and Appeals commented on the extent of the railroad's duty, noting that "[t]here was no proof that the platform was not constructed in the ordinary way, nor that the space was greater than the exigencies of business required."  Dotson v. Erie R.R. Co., 68

38

N.J.L. 679, 685 (E. & A. 1903). The Court reached that conclusion by considering such factors as whether the dimensions of the platform were sufficient to accommodate passengers boarding and disembarking from trains, whether the platform was close enough to the rails to permit safe entry and exit, and whether the platform provided sufficient space to allow passage when considering the fact that trains ordinarily have parts that project to the sides and may intrude on the platform. Id. at 684-85. Read in the context of the Court's evaluation of the duty owed to the patron of the railroad, the phrase "exigencies of business" meant general needs of the business operation. Ibid.; accord Feil v. W. Jersey & Seashore R.R. Co., 77 N.J.L. 502, 503-04 (E. & A. 1909) (affirming dismissal of law suit by passenger injured while walking along platform who unexpectedly stepped into properly designed, well-maintained depression in platform, referred to as a truckway, used by railroad to transfer luggage between cars); see also Cullen v. W. Jersey & Seashore R.R. Co., 85 N.J.L. 708, 710-11 (E. & A. 1914) (distinguishing Feil based on plaintiff's allegation that truckway design was negligent).

In an analogous context, the Supreme Court used the phrase "exigencies of business" in addressing a dispute about whether property owned by a railroad was taxable. See State v. Haight, 35 N.J.L. 40, 46 (Sup. Ct. 1870). There, the court, in applying

39

the doctrine that taxation depended on actual use, relied on the phrase to comment on the difference between actual and potential use. The court explained that "[l]ands which a company has purchased and is holding merely with a view to an appropriation to business in the future, if the exigencies of business should require them, may be said to be held as a matter of convenience to the company, and not to be necessary to the prosecution of the objects of its incorporation." Ibid. As used in that context, the phrase again was used to mean needs of the day or general needs of the business.

There are, as well, a number of decisions reached in disputes that have arisen in other contexts to which we may turn to shed light on the historical understanding of the phrase "exigencies of business." The Court of Errors and Appeals, in considering whether possessory interest in bonds should be tested in accordance with holder in due course principles, used the phrase as if it meant something more akin to convenience. See Morris Canal & Banking Co. v. Fisher, 9 N.J. Eq. 667, 699 (E. & A. 1855). That is, after commenting that bank notes are so construed, the court observed that "[b]y analogy to this class of cases, the exigencies of business have from time to time introduced other securities into the same category." Ibid.

Likewise, the Court of Errors and Appeals used the phrase to describe a general course of business in the context of

40

whether a note was properly dishonored by a bank.  See Fifth Ward Sav. Bank of Jersey City v. First Nat'l Bank of Jersey City, 48 N.J.L. 513, 522 (E. & A. 1886) (observing that "[c]all loans on notes payable on demand . . . are a common method with banks of loaning unemployed funds, and it is usual to raise money, when required by the exigencies of business, on such notes and collaterals, by transferring them to other banks").

Finally, the phrase was employed by the Vice Chancellor to distinguish between forfeitures that call for the intervention of the courts of equity and those that do not.  See N. Jersey St. Ry. Co. v. S. Orange, 58 N.J. Eq. 83, 91-92 (Ch. 1899).  In that decision, the Vice Chancellor described the "class of cases comprising mercantile contracts where the exigencies of business and trade require that a party having paid a sum of money on a particular account and agreeing to pay a further sum on a certain day on the same account, and failing to pay such sum, should lose what he has already paid."  Distinguishing that class of cases, the court declined the application by a municipality seeking to declare a forfeiture of streetcar property.  Ibid.

As these decisions illustrate, when courts have been called upon to interpret the meaning of the phrase "exigencies of business" in the past, it has been regarded as a term of art. As such, it has been understood to describe generally the needs

41

of business, or the ordinary course of business, rather than to allude to an emergent, urgent, immediate, or pressing need. Indeed, it is the influence of our modern jurisprudence in the criminal context that has imbued the term with those notions. We conclude, as we must, that the Legislature meant the phrase "exigencies of business" to be understood in accordance with the way in which it was used at the time when the language was chosen.

Moreover, that understanding of the phrase is the most sensible one when considering the way in which railroads operate. Simply put, demanding that the railroad demonstrate that there is an urgency or an immediacy that motivates its exercise of eminent domain to acquire a tract of land, as Intermodal suggests, would require us to close our eyes to the reality of how railroads are developed and built. Long-term planning is critical to rail transport, and we detect no basis on which to conclude that the Legislature intended to demand that railroads prove urgency, immediacy or emergency of their need for land as a prerequisite to exercising their statutory condemnation power.

V.

The judgment of the Appellate Division is affirmed.

CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN and PATTERSON; and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE HOENS's opinion.

42

SUPREME COURT OF NEW JERSEY

NO.    A-117                         SEPTEMBER TERM 2011

ON CERTIFICATION TO        Appellate Division, Superior Court


NORFOLK SOUTHERN RAILWAY
COMPANY, a Virginia
Corporation,

        Petitioner-Respondent,

                v.

INTERMODAL PROPERTIES, LLC,

        Respondent-Appellant.



DECIDED        August 6, 2013
                Chief Justice Rabner                    PRESIDING
OPINION BY        Justice Hoens
CONCURRING/DISSENTING OPINIONS BY
DISSENTING OPINION BY


| CHECKLIST | AFFIRM | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE HOENS | X | |
| JUSTICE PATTERSON | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 7 | |